COMMONWEALTH *vs.* RONALD GORDON.

Suffolk.    October 6, 1969. — January 19, 1970.

Present: WILKINS, C.J., SPALDING, CUTTER, KIRK, SPIEGEL, & REARDON, JJ.

*Evidence*, Recross-examination, Judicial discretion.    *Practice, Criminal,* Disclosure of evidence before grand jury.    *Error,* Whether error harmful.

At a trial for serious crimes committed against a woman, where she testified on direct examination that she had copied on a matchbook an address which she had seen in the defendant's apartment, and the first reference to the matchbook thereafter was on recross-examination when the victim was asked whether she had testified about the matchbook before the grand jury, the exclusion of such question was within the judge's discretion.    [602]

At a trial for serious crimes committed against a woman, where she testified on redirect examination that as she was leaving the defendant's apartment he told her that he had planned to kill her, and on recross-examination she testified that only a few days before trial had she told the prosecutor about such statement, there was no error in the exclusion of a question then asked as to whether she had testified about such statement before the grand jury.    [602]

Testimony by the victim of serious crimes as to a threat which was made to her by the defendant after the crimes had been committed and which was not an essential element of any of them and was peripheral did not demonstrate a "particularized need" for an inspection of her testimony before the grand jury, and there was no error in a denial of the defendant's motion therefor first brought to the court's attention upon completion of the victim's testimony on the third day of trial.    [602–603]

Where testimony of the father of the victim of serious crimes was ad-
    mitted at the trial of indictments therefor over the defendant's ob-
    jections and exceptions and subsequently the father's testimony un-
    expectedly appeared to be inadmissible, and the judge then struck it
    out and directed the jury to "disregard" it and to "discharge it
    from . . . [their] minds and memories as if it had never been given,"
    the exceptions were overruled. [603–604]

INDICTMENTS found and returned in the Superior Court
on February 12, 1968.

The cases were tried before *Goldberg,* J.

*Reuben Goodman* (*Thomas J. Herbert* with him) for the
defendant.

*William J. Doyle,* Assistant District Attorney, for the
Commonwealth.

REARDON, J. The defendant is here on a bill of excep-
tions. At a trial in the Superior Court he was found guilty
on three indictments severally charging him with rape,
assault with a dangerous weapon, and kidnapping, and was
thereafter sentenced to a correctional institution.

In relevant part the testimony was as follows. An
eighteen year old girl, named in the indictments as the
victim, was approached by the defendant after she alighted
from a bus at Blue Hill Avenue and Wales Street in Boston
on a stormy day in January, 1968, while on her way to work
about a half block away. The defendant asked her if she
wished any trouble, to which she replied, "No." He said,
"See what I got here," while keeping his hand in his jacket
pocket, and advised her to come along with him. She
accompanied him to his apartment on Esmond Street where
within a half hour she saw the defendant take a knife from
a coat pocket. After some discussion of difficulties the
defendant alleged he was having with a girl friend, the
victim suggested that she should call the Salvation Army
Day Care Center where she was employed to tell her em-
ployer that she would not be reporting for work. Her
testimony was that through this means she hoped to alert
the Center that help might be summoned. The defendant
and the victim proceeded to a drug store three or four
blocks away to make the call. The victim stated that at

this time "she was frightened and confused," that the defendant stood in the doorway of the telephone booth during her telephone conversation, and that there were in the store at the time two elderly people, a man and a woman. Thereafter she purchased some cigarettes and some cookies at the drug store. The defendant and the victim then returned to the apartment where, after further conversation, the defendant brought her to his bedroom, undressed her and had intercourse with her, covering her face with a pillow to stifle her outcries. Thereafter, at the behest of the defendant, the victim donned some orange slacks which were not hers. There was further conversation about his difficulties with his girl friend to whom he wished the victim to make a telephone call on his behalf, and the defendant had her practice "at least five times" a message she was to give to this individual over the telephone. About 1:30 P.M. the pair went to a supermarket and the call to the defendant's girl friend was placed by the victim. There were people in the market at the time but the victim made no attempt to cry out to them, claiming she was constantly in a state of fear. After the telephone call they purchased some hamburg and veal cutlets. Upon returning to the apartment the defendant tied the victim to a chair in a closet, gagged her with a scarf, and warned her not to escape. He left the apartment and returned within fifteen minutes to check on whether she was still tied. He departed again and returned in about an hour, during which time the victim freed herself but remained in the closet, stating that she was afraid that the defendant or "some friends were waiting outside" because there was a lot of noise that she heard. While in the closet she noticed a box containing the name and address of the defendant's girl friend. She copied the address on a matchbook. Upon the return of the defendant she told him he could trust her "not to go to the police because she hadn't tried to escape," and asked permission to leave. The defendant then dragged her into a bedroom where he disrobed her and had sexual intercourse with her again, covering her mouth with a

pillow to stifle outcries. About 5 P.M. they both left the apartment and took a cab to the Ashmont Station where they separated after saying "that they didn't want to see each other again."

There was evidence that on the journey to the drug store their path took them by the Salvation Army Day Care Center, and that they had passed a funeral procession of at least three cars containing passengers stopped along the sidewalk on which they were walking. While in the apartment the victim made coffee at one point and at another cooked and ate the hamburg which had been purchased. The victim testified that she was in a state of fear throughout the day notwithstanding the conversations in which she engaged with the defendant on a wide range of subjects including the possibility of "having a black child," her belief and participation in the activities of the civil rights movement, "that at the age of eight she had a crush on a negro," that she had on occasion smoked "pot," and that she had engaged in prior sexual relations with a boy friend. She described the defendant's appearance during the day saying that "[a]t times he was violent and approaching violence, irrational, frightening, and sometimes after talking he became calm and somewhat reasonable and not violent." She also testified that as she was leaving the apartment for the last time the defendant said that he had planned to kill her and that he had some friends who were going to pick up her dead body.

Medical examination made of the victim at 11:45 P.M. on the day of this happening disclosed the presence of male sperm in the vagina of the victim within forty-eight hours of the examination and no evidence of trauma on the victim's body, face or thighs.

On recross-examination she said that only a few days before she had told the prosecuting attorney about the conversation with regard to the possibility of her being killed. Counsel for the defendant asked her whether she had testified to this before the grand jury and the court excluded the question, to which exclusion an exception was taken.

Counsel for the defendant then asked her whether she had testified before the grand jury with reference to the matchbook. This question was also excluded and the defendant excepted. Relative to the matchbook, she had testified she had retained it in her jewelry box "from shortly after January 8, 1968 and brought it to this court at the request of the prosecuting attorney."

When the victim had completed her testimony counsel for the defendant advised the court that a motion for inspection of grand jury minutes had been referred to the trial judge by another judge who had been engaged in preliminary matters concerning the case. Counsel then moved for permission to inspect the grand jury minutes of her testimony in its entirety or, in the alternative, that the court review the minutes of her testimony before the grand jury to determine whether any discrepancies in her testimony existed with regard to the occurrence of any violence, the matchbook, and the condition of her clothing. The motion was denied by the court on the ground that this was the first time it had been brought to the court's attention and "this was the third day of trial." The defendant took an exception.

1. We consider first the evidence on the matchbook. It is our view that the issue argued by the defendant did not arise until recross-examination of the victim when counsel inquired of her whether she had told the grand jury about the matchbook. The exclusion of the question was proper in the discretion of the judge who can limit recross-examination to new matter adverted to on redirect-examination.

On redirect-examination the witness testified to the threat which the defendant allegedly made to kill her, which threat was made as she left his apartment. It was only on recross-examination that she told defence counsel that it was but a few days before trial when she advised the District Attorney about the threat. Upon inquiry by defense counsel as to whether she had so testified before the grand jury the question was excluded. There was no error in the ruling. Her testimony that she had told the District Attorney but a

few days before carried the clear and reasonable implication that she had not so earlier told the grand jury. If the grand jury minutes were examined, and in fact disclosed that she had not so testified, that would not make a lie of her story on the stand. It would confirm the implication that she had told the District Attorney and had told him but a few days before. If on the contrary the minutes showed that she had testified to the grand jury about the threat, the minutes would serve then to show that she was consistent in her testimony and that the threat was not a recent invention. In any event, the threat if made was made after the several crimes charged had been committed, was not an essential element of any of them, and was peripheral to the whole affair. We conclude that no "particularized need" was demonstrated to examine the grand jury minutes, and observe that the record does not disclose that counsel made any effort to persuade the judge that such a need did exist. See *Commonwealth* v. *Carita, ante,* 132, and cases cited.

2. The father of the victim testified that arriving home about six-thirty on the evening of January 8, 1968, he was told by his daughter of her experience. Over the defendant's objections and exceptions on the ground that the father's observations were the result of illegal entry and required a voir dire, the father testified that about 8:30 or 9 P.M. he entered the defendant's apartment with members of the Boston police. He described the layout of the defendant's apartment and told of having seen in the closet the material employed to gag his daughter. A police sergeant was later asked about conditions that he found in the apartment. Defence counsel objected and sought a voir dire which the trial judge granted. Upon the voir dire the trial judge found the entry to the apartment was without a warrant and, hence, illegal, and instructed the jury to disregard the prior testimony of the father relative to his observations in the apartment and to discharge it from their minds.

The evidence which is complained of seems to have been a surprise to all except the District Attorney. There had been no pre-trial motion to suppress in accord with Rule 101B

of the Superior Court (1954). The trial judge was obviously unaware of the illegal search until the evidence developed. He then instructed the jury relative to the father's testimony as follows: "During the session this morning, the witness . . . [the father], testified to certain observations he made in the apartment on Esmond Street. I now strike that testimony out and instruct you to disregard that testimony and to discharge it from your minds and memories as if it had never been given. That would have nothing at all to do with the case." While we recognize that there are certain circumstances under which error is not alleviated by instructions to the jury (see *Worcester Telegram & Gazette, Inc.* v. *Commonwealth,* 354 Mass. 578), we shall not assume that jurors will slight strong and precise instructions of the trial judge to disregard the matters which have been withdrawn from their consideration. *Commonwealth* v. *Bellino,* 320 Mass. 635, 645. It is difficult to envision any stronger instructions which might have been given to cure the situation which confronted the judge. See *London* v. *Bay State St. Ry.* 231 Mass. 480, 485–486; *Commonwealth* v. *Cabot,* 241 Mass. 131, 150–151; *Commonwealth* v. *Crehan,* 345 Mass. 609, 613, and cases cited.

*Exceptions overruled.*