## Commonwealth vs. Jean Marie Gagnon (and companion cases[1]).

Hampden. June 9, 1982. — May 27, 1983.

Present: Perretta, Kass, & Smith, JJ.

*Practice, Criminal,* Comment by prosecutor, Argument by prosecutor, Challenge of jurors, Discovery, Disclosure of statement by witness. *Jury and Jurors. Constitutional Law,* Jury, Search and seizure. *Search and Seizure,* Foreign country. *Evidence,* Informer, Photograph, Impeachment of credibility, Prior conviction. *Identification. Witness,* Impeachment.

A district attorney's remarks during a criminal trial expressing personal belief in the credibility of the Commonwealth's witnesses, when considered in the context of a record which revealed other incidents of the same kind and which disclosed insufficient curative measures by the judge, required reversal of the defendants' convictions. [114-117] Smith, J., dissenting.

With respect to a criminal case tried before the decision by the Supreme Judicial Court in *Commonwealth* v. *Soares,* 377 Mass. 461, cert. denied, 444 U.S. 881 (1979), but which was on direct appeal when *Soares* was decided, this court concluded that the record was adequate to raise the issue whether the prosecution had exercised its peremptory challenges of prospective jurors in a manner calculated to exclude persons with French surnames from the jury "solely on the basis of bias presumed to derive from [their] membership in [an ethnic] group," notwithstanding counsel's failure to object at trial to the conduct complained of on appeal. [117-119] Smith, J., dissenting.

At the trial of three French-Canadian defendants, the prosecutor's use of peremptory challenges to exclude 19 prospective jurors with French surnames, constituting 83% of such prospective jurors, was sufficient to show a pattern designed to exclude a discrete ethnic group from the jury, requiring reversal of the convictions. [119-121] Smith, J., dissenting.

Neither the prosecution nor the defense at a criminal trial would be entitled to have a prospective juror excused because he or she might understand the foreign language used by a potential witness. [121]

[1] Against Louis P. Bourgeois and Norman Gagne.

Evidence seized in a warrantless search of a defendant's apartment and locker, occurring in the Canadian province of Quebec and undertaken by Canadian law enforcement officers, was not rendered inadmissible at the defendant's Massachusetts trial for armed robbery and other serious crimes by reason of failure of Canadian police to conform to requirements of the Fourth Amendment to the United States Constitution, where nothing about the officers' conduct was shocking to the judicial conscience, and where apparently there was no direct participation by American police in the search. [122-124]

At a criminal trial no error appeared in the judge's refusal to allow defense counsel to make inquiry of a Canadian police witness as to the identity of the informant who prompted Canadian police to search a defendant's locker and apartment in Canada, where the witness had explicitly testified that the informant was a Canadian policeman and where other circumstances showed little likelihood that the testimony sought would reveal the very close collaboration by American police that would make the foreign search subject to Fourth Amendment guarantees. [124-126]

Where a defendant's pretrial motion for inspection of such written statements of prospective prosecution witnesses as were available and related to these persons' anticipated testimony at trial had been allowed, it was error for the judge presiding at the defendant's trial to refuse the defendant's request that he make an in camera inspection of a report prepared by a Canadian police officer and not previously shown to the defendant, to see whether it cast doubt on the officer's oral testimony. [126-127]

No error appeared in permitting a police officer to give testimony matching certain photographs, recorded by a bank's surveillance camera a week before the holdup, with two defendants being tried on charges arising from a holdup of the bank, where the defendants had altered their appearances between the time the photographs were taken and the time of trial, and where the witness was familiar with their earlier appearances. [127-128]

At the trial of criminal charges arising from the holdup of a bank, it was error to admit in evidence a photograph of two of the three defendants which had been recorded by the bank's surveillance camera a week before the holdup and which had been marked in a manner permitting the inference that the defendants were known to Canadian police where, in view of similar photographs admitted in evidence, the marked photograph lacked evidentiary value. [128-129]

At the trial of three defendants on criminal charges arising from the holdup of a bank, ineffectiveness of counsel for one of them did not appear from the fact that counsel was not shown to have ascertained whether that defendant had, or had waived, counsel at the time of his Canadi-

an criminal convictions which were admitted in evidence, with counsel's acquiescence, for impeachment purposes. [129-130]

Where a criminal defendant seeks exclusion of evidence of his criminal convictions occurring in a foreign country, offered by the prosecutor for impeachment purposes, the burden is on the defendant to demonstrate that the convictions were obtained through procedures so unfair as to require their exclusion. [130-132]

INDICTMENTS found and returned in the Superior Court on July 12, 1977, August 16, 1977, and September 16, 1977.

The cases were tried before *Tisdale, J.*

*Virginia Nia Lee* for Jean Marie Gagnon.

*Richard B. Klibaner* for Norman Gagne.

*Robert L. Sheketoff* for Louis P. Bourgeois.

*John T. McDonough,* Assistant District Attorney, for the Commonwealth.

KASS, J. Highly competent police work resulted in the arrest and conviction of the defendants of armed robbery while masked of an employee of a bank,[2] armed assault with intent to murder,[3] attempted murder,[4] assault and battery on a police officer,[5] and assault and battery by means of a dangerous weapon.[6] Regrettably, the trial was sufficiently tainted with error to require reversal of the judgments and a new trial.

We sketch an outline of facts which the jury could have found, leaving details to discussion of the particular points on appeal to which they are relevant. On June 10, 1977, shortly after 10 A.M., three men, gloved and masked, robbed a branch of the Shawmut First Bank in Springfield. Two, at least, were armed. One vaulted the tellers' counter, and the other two joined him there. The robbers took money out of the teller drawers and made their escape, with about $126,000, by a back or side door to an alleyway.

---

[2] G. L. c. 265, §§ 17 & 21.

[3] G. L. c. 265, § 15.

[4] G. L. c. 274, § 6.

[5] G. L. c. 265, § 13D.

[6] G. L. c. 265, § 15A.

While the robbery was in progress — it did not take more than three minutes — the branch manager activated a holdup alarm.

The first officer to respond was Edward Petrick, Jr., driving a marked cruiser. Petrick arrived on the scene as the branch manager emerged; the manager pointed to an alley, from which a sedan was emerging. In that vehicle were three men, one of whom was pulling off a stocking mask. Petrick gave chase in his cruiser and was answered with gunfire. At one point the getaway car had to stop in a line of traffic and two men, whom Petrick later identified as Gagne and Bourgeois, alighted and directed a fusillade of gunfire at Petrick. When Petrick's car, too, came to a stop, he scrambled out and was wounded by gunfire.

These events were scarcely calculated to avoid attention, and, indeed, several witnesses observed the escape car, a Ford LTD, and noted its license plate number. Two robbers switched from the LTD to a Ford Mustang; that car's license plate was also noted. Each plate evidenced a Quebec registration. Through motel registrations, the trail led to Bourgeois and Gagnon, who were Canadians. Further investigation led to Gagne and one Paquette, who is not a defendant in this case.

On February 4, 1978, Corporal Andre Dube, a Quebec police officer, searched a locker and apartment at 714 Sicotte Street, in the city of Quebec, and found guns, a road map of Springfield, a red knitted cap with two holes for eyes, a bullet proof vest, newspaper clippings about the Springfield holdup, over $1,000 in American money, photographs and other documents and items which linked the owner of the apartment to the Springfield affair. The apartment was leased to one Gilles DeNeuville which, it turned out, was an alias of the defendant Gagnon.

In addition to Petrick's in-court identification, a bystander, Maurer, identified Gagnon in court, and a motel maintenance man identified Gagne in court. Over $3,000 in American money found in the possession of Gagne and Pa-

quette bore serial numbers traceable to the Springfield bank. We turn to the individual issues.

1. *Prosecutorial error.* During cross-examination of Officer Petrick on the tenth day of trial on which evidence was received, trial counsel for Gagne, Mr. Serota, probed for inconsistencies between Petrick's trial testimony and a written statement Petrick had made earlier. Petrick was an important witness for the prosecution on the issue of identification. The following colloquy occurred.

> MR. SEROTA: "From the comma [referring to a page of Petrick's statement], 'I tried to run them down, and at the same time call in the information to the Station.' Now as to that phrase in your statement is that true?"
> MR. RYAN (the district attorney): "I object."
> THE COURT: "The grounds, Mr. Ryan?"
> MR. RYAN: "I object to the statement, is that true. I would assume any witness we put on here —"
> MR. SEROTA: "I object to that statement."
> MR. RYAN: "— we vouch for their credibility, and I don't think that that's the proper way to characterize a question."
> THE COURT: "Side bench."

At the side bar defense counsel objected vociferously to the district attorney's vouching before the jury for the credibility of his witnesses, and Mr. Serota moved for a mistrial. Mr. Gordon, who represented Gagne, specifically requested that the jury be instructed that it was an improper remark. At the conclusion of the side bar conference, the judge said: "The jury will disregard comments of counsel completely. The question will go out, and if you heard an answer [none had been made], that goes out."

Assertion of personal opinion as to the credibility of a witness or as to the guilt of an accused is prohibited by S.J.C. Rule 3:07, DR 7-106(C)(4), 382 Mass. 787 (1981), previously appearing as S.J.C. Rule 3:22, DR 7-106(C)(4),

359 Mass. 822 (1971). *Commonwealth* v. *Smith*, 387 Mass. 900, 906 (1983). For counsel to state a belief as to the credibility of a witness "is peculiarly unfortunate if one of them has the advantage of official backing." *Greenberg* v. *United States*, 280 F.2d 472, 475 (1st Cir. 1960). See also *Commonwealth* v. *DeChristoforo*, 360 Mass. 531, 545-547 (1971) (Tauro, C.J., dissenting). Compare *Orebo* v. *United States*, 293 F.2d 747, 749-750 (9th Cir. 1961), cert. denied, 368 U.S. 958 (1962).

Often, when improper statements of belief are argued, the question is whether, in context, the prosecutor was stating a personal opinion or commenting acceptably on the evidence. See, e.g., *Commonwealth* v. *Stone*, 366 Mass. 506, 516 (1974); *Commonwealth* v. *Bradshaw*, 385 Mass. 244, 275 (1982). Here, by contrast, there was a wholesale vouching for the credibility of all the prosecution's witnesses. "The point is that the representative of the government approaches the jury with the inevitable asset of tremendous credibility — but that personal credibility is one weapon he must not use." *United States* v. *Gonzalez Vargas*, 558 F.2d 631, 633 (1st Cir. 1977). That asset is the more potent where, as here, the prosecutor is the district attorney himself, a figure likely to be known to the jurors. As in the *Gonzalez Vargas* case, there are none of the extenuating circumstances that cause courts to shrug off an excess of counsel, viz., provocation by opposing counsel (Mr. Serota's gambit of attacking Petrick's credibility by pointing out inconsistencies with prior statements was hardly an unusual tactic), "absence of an objection, or a timely curative instruction directed particularly to the prosecutor's comments." *Ibid.* "The jury will disregard comments of counsel completely," scarcely came to grips with the problem. Compare *Commonwealth* v. *Hoppin*, 387 Mass. 25, 28-32 (1982), where strong and precise instructions, although somewhat belated, did not neutralize a prosecutorial error. We are constrained to reverse and "do so unhappily." *United States* v. *Gonzalez Vargas*, 558 F.2d at 633. The court in *Gonzalez Vargas* was unhappy "because the

trial was otherwise a good trial." *Ibid.* That cannot be said of the trial of the instant case, which was a ragged one. Nonetheless, we reverse with some reluctance because the evidence of guilt accumulated by the Commonwealth was so strong and so much trial time (thirty days) has already been spent. "[P]rosecutorial misconduct unnecessarily risks reversal of a conviction that otherwise might have been affirmed — all at great cost to the Commonwealth as well as to the defendants." *Commonwealth* v. *Smith,* 387 Mass. 900, 904 (1983).

Nor was this the only incident of the kind. Earlier, when Mr. Shulman, counsel for Gagnon, was cross-examining another prosecution witness, Micheline Roy, he began a question with the words, "is it true." The district attorney, in objecting to the question said, "Excuse me, I'm going to object, if your Honor please, to the prefacing of any question, 'is it true.' I would assume that everything she is saying is true." The judge observed, "Yes, my thought, too." Defense counsel did not object and rephrased the question.

During closing argument the district attorney stepped very close to, if indeed not over, the line several times by stating his views. On one occasion, he remarked, "Eddie Petrick isn't a liar. Eddie Petrick told you exactly what he saw." He said of two other witnesses respectively: "a very honest witness on the stand, who wants to help and tell you the truth" and "a very, very, very honest witness."

As to the witness Margaret Nelson, the district attorney told the jury in closing argument about things she had told him in an interview but which, he explained to the jury, could not be introduced because they were hearsay. This accomplished a double fault: it discussed testimony not in evidence and suggested the Commonwealth had more evidence in its quiver which would have been used, but for technical obstacles. See *Commonwealth* v. *Ryan,* 8 Mass. App. Ct. 941 (1979). It is an inadequate justification for referring to Nelson's extra-judicial statements that some of the subjects they touched on had been referred to in a deposition of Nelson which one of the defendants put in evidence.

To none of these later remarks did the defendants object. Accordingly, claims of appeal based on them are lost, *Commonwealth* v. *Underwood,* 358 Mass. 506, 509 (1970), unless we consider them in order to avoid a substantial risk of a miscarriage of justice. *Commonwealth* v. *Freeman,* 352 Mass. 556, 563-564 (1967). *Commonwealth* v. *Daigle,* 379 Mass. 541, 549 (1980). As such incidents multiply during the course of a trial, the specter of a miscarriage of justice becomes more difficult to exorcise. Since, however, for the reasons stated in this opinion, it will be necessary to try this case again, we shall content ourselves with an admonition that the prosecutor, on retrial, would be well advised to adhere to the requirements of *Commonwealth* v. *Earltop,* 372 Mass. 199, 204-207 (1977) (Hennessey, C.J., concurring), *Commonwealth* v. *Shelley,* 374 Mass. 466, 470-472 (1978), *Commonwealth* v. *Smith,* 387 Mass. at 903, *Commonwealth* v. *Villalobos,* 7 Mass. App. Ct. 905 (1979), and *Commonwealth* v. *Hogan,* 12 Mass. App. Ct. 646, 651-652 (1981), to mention a sample of authorities. Compare *Commonwealth* v. *Mahdi,* 388 Mass. 679, 690-699 (1983).

2. *Validity of peremptory challenges of jurors.* Trial of this case began on May 1, 1978, and jury selection, which consumed nine court days, ended on May 12, 1978.[7] The defendants complain that the prosecution exercised its peremptory challenges to exclude persons with French surnames from the jury "solely on the basis of bias presumed to derive from [their] membership in [that] group." *Commonwealth* v. *Soares,* 377 Mass. 461, 488, cert. denied, 444 U.S. 881 (1979). *Soares* had not been decided when the case before us was tried, but the rule adopted in *Soares* applies to defendants in all cases pending on direct appeal on the date of the *Soares* decision "where the record is adequate to raise the issue." *Commonwealth* v. *Soares,* 377 Mass. at

---

[7] The trial went on until 10:50 P.M. on June 14, 1978, when the jury returned their verdicts. We anticipate that the jury selection process and the trial can be substantially expedited when the case is tried again.

493 n.38.  The instant case was on direct appeal (notices of appeal having been filed June 19, 20, and 26, 1978) when *Soares* was decided and is distinguishable from *Reddick* v. *Commonwealth*, 381 Mass. 398, 399-404 (1980), in which the court held that the *Soares* principle should not, in all but a narrow category of cases (not here relevant), be applied retroactively in cases where direct appeal rights have been exhausted — or have expired — and there is a postconviction or collateral attack.

There were twenty-three persons with names that were arguably French[8] called from the venire, and the prosecution challenged nineteen of them.  The defense challenged the other four.  The jury selected, consequently, contained no persons with apparent French names.

Assuming, for the moment, an intent by the prosecution to exclude those of French-Canadian origin from the jury, none of the defendants complained about it at trial.  This was hardly to be wondered at since attacks on peremptory challenges designed to keep distinct groups off a jury had prior to *Soares* been peremptorily rejected.  See, e.g., *Commonwealth* v. *Mitchell*, 367 Mass. 419, 420 (1975); *Commonwealth* v. *Cranshaw*, 4 Mass. App. Ct. 630 (1976).  See also *Swain* v. *Alabama*, 380 U.S. 202, 220-224 (1965).  The question arises, nevertheless, whether "the record is adequate to raise the issue" without express objection or calling of attention to the peremptory challenges complained of. We read *Soares* and *Reddick* as permitting the question to be raised in a case on direct appeal when *Soares* was decided if the facts on which the question is to be decided can be gleaned from the transcript.  See *Reddick* v. *Com-*

_____

[8] In the order in which they were called they were: John R. Dubiel, Charlene F. Martial, Ronald Bonneville, Jeanette Bazinet, Paul D. Viens, Clara B. Turgion, Roger Rouillard, Donald Roberts, Raymond Christian, Carol A. Berne, Lawrence J. Emerle, Jeanne Hugard, Joseph A. Gentile, Paul C. Rame, Theresa Roy, Rita A. Castor, Norman Plasse, Robert W. Morin, Barbara LaFlash, Debra A. LaBonte, Albert E. Bergeron, Louis A. Bolduc and Richard A. Monfette.  Others who were challenged had surnames which may have been French-Canadian, but we confine ourselves to the names called to attention in the briefs.

*monwealth.* 381 Mass. at 403; *Commonwealth* v. *Robinson,* 382 Mass. 189, 195 n.4 (1981); *Commonwealth* v. *Mahdi,* 388 Mass. at 689-690. Indeed, it would be captious and cynical to say that the door was open on direct appeal cases and then to slam the door shut because lawyers failed to object to practices which were approved under the governing State and Federal cases. The issue, involving subsequent developments in constitutional law, is one as to which courts do not require defense counsel to be clairvoyant. *Commonwealth* v. *Kater,* 388 Mass. 519, 533 (1983). Compare *Commonwealth* v. *Walker,* 379 Mass. 297, 300 (1979), in which no exceptions were taken at trial, but the defendant noted for the record the prosecution's challenges of black persons and raised the issue on a motion for a new trial. The transcript here is adequate in terms of disclosing: (1) the number of challenges; (2) the manner of challenge; (3) the names of persons seated; and, (4) the percentage of various groups challenged, to enable us to consider whether the peremptory challenges were designed to exclude a discrete group.

It may fairly be asked whether, in a society as heterogeneous as ours, it is wise to fragment the population excessively into subgroups. To do so runs counter to cherished and valid notions of America as a melting pot. Moreover, names are anglicized, women adopt married names, and names becomes less than a totally reliable badge of ethnic identity. A member of the venire with the less than Gallic name of Wanda J. Clark, for example, said her grandfather was of French-Canadian descent. (She was challenged by the prosecution.) In the Northeast, however, French-Canadians have been recognized as a group with distinct cultural and linguistic traditions, and it is perhaps enough, for purposes of this case, to recognize that the prosecutor regarded French-Canadian identity as a significant factor in jury selection. He expressed his view that where the jurors were born was very important. He attributed significance to a maple leaf pin which a prospective juror was wearing

and later challenged him.[9]   Among the "generic group af-
filiations which may not permissibly form the basis for juror
exclusion" is national origin.   *Commonwealth* v. *Soares,*
377 Mass. at 488-489 & n.33.   Cf. *Commonwealth* v. *Festa,*
369 Mass. 419, 430 (1976).

The percentage of persons with French surnames who
were challenged was high:  eighty-three percent (compared
to ninety-two percent of eligible black jurors in *Soares*).
Thirty-six percent of jurors who did not have French names
were challenged.   The number of persons of apparent
French ethnicity who were challenged by the prosecution,
nineteen, was relatively high.   This was not a case where
only one member of the group was challenged.   See
*Commonwealth* v. *Clark,* 378 Mass. 392, 407-408 n.17
(1979).   As the number of members of a particular group
who are challenged grows larger, the presumption of proper
use of the peremptory challenge grows weaker.   Cf. *Com-
monwealth* v. *Walker,* 379 Mass. at 301.   That the prosecu-
tion was prepared to let four persons with French surnames
sit as jurors, on the other hand, supports the presumption of
propriety.   See *Commonwealth* v. *Kelly,* 10 Mass. App. Ct.
847 (1980) (three blacks seated, two excluded). On balance,
however, the challenge of nineteen members of a particular
class, a number higher than in *Soares* and in the cases noted
in the margin dealing with the *Soares* issue,[10] on the facts

---

[9] There were sound reasons for making a peremptory challenge to the
seating of this particular member of the venire apart from his French
sounding surname.   The wearing of a maple leaf pin could have been
viewed by the prosecution as a symptom of chauvinism which might
weigh the scales against the prosecution in the trial of three French-
Canadians.   Moreover, there was some suggestion that the prospective
juror was a distant relative of the prosecutor.

[10] *Commonwealth* v. *Soares,* 377 Mass. 461, 473 (1979) (12 in group
challenged, 1 seated).   *Commonwealth* v. *Williams,* 378 Mass. 217, 221
(1979) (1 challenge).   *Commonwealth* v. *Clark,* 378 Mass. 392, 407-408
n.17 (1979) (1 challenge [only black in venire]).   *Commonwealth* v.
*Walker,* 379 Mass. 297, 300 (1975) (5 challenged, 2 seated).   *Common-
wealth* v. *Robinson,* 382 Mass. 189, 195 (1981) (3 challenged, none
seated).   *Commonwealth* v. *Reid,* 384 Mass. 247, 251 (1981) (6 chal-
lenged [all males on the panel]).   *Commonwealth* v. *Little,* 384 Mass.

in this case,[11] shows a pattern designed to exclude a discrete group from the jury. *Commonwealth* v. *Soares*, 377 Mass. at 490.

We have considered whether the prosecution could properly have apprehended that potential jurors of French-Canadian background might know French and would follow the original testimony of French-speaking witnesses (including the defendants) rather than translation of the testimony into English. Of the twenty-three potential jurors with French-Canadian surnames whom we have considered, ten admitted to understanding French, although some said their French was rusty. All twenty-three had passed a preliminary screening by the judge in which he allowed to remain in the jury pool only those jurors who had agreed to be bound by the translation into English. As is generally the case with instructions to jurors, we proceed on the premise that the jury will abide by them. *Commonwealth* v. *Gordon*, 356 Mass. 598, 604 (1970). But see *Commonwealth* v. *DiMarzo*, 364 Mass. 669, 681 (1974) (Hennessey, J., concurring). Neither party, as the court observed in *Commonwealth* v. *Festa*, 369 Mass. at 430, has the right to have a juror excused solely because that juror may understand the language of the witness.

Accordingly, the jury selection process was defective under art. 12 of the Massachusetts Declaration of Rights, and this would entitle the defendants to a new trial. *Commonwealth* v. *Soares*, 377 Mass. at 486.

---

262, 264 (1981) (1 challenge). *Commonwealth* v. *Kelly*, 10 Mass. App. Ct. 847 (1980) (2 blacks challenged, 3 seated). *Commonwealth* v. *Brown*, 11 Mass. App. Ct. 288, 293 (1981) (3 blacks, 1 Hispanic challenged). *Commonwealth* v. *DiMatteo*, 12 Mass. App. Ct. 547, 551 (1981) (1 challenge [only black]). *Commonwealth* v. *Smith*, 12 Mass. App. Ct. 667, 675-676 (1981) (3 peremptory challenges). Of course, the absolute number of challenges of members of a group is significant only if they constitute a high percentage of that group.

[11] The challenges were made after routine questions put by the judge, and no reasons for challenge appear except for the juror who wore the maple leaf pin (see note 9, *supra*) and a juror whose answers to the routine questions might have given the prosecutor reason to believe that the prospective juror was indecisive.

3. *Evidence seized in warrantless search.* Roughly one month before the trial began, there was a hearing, which consumed ten days, on motions to suppress inculpatory evidence seized by Canadian police and made available to the police in Springfield. The judge denied the motions but made no findings of fact to support his ruling, a circumstance which handicaps our review. See *Commonwealth* v. *Garcia*, 379 Mass. 422, 428 (1980) ("We emphasize once again the importance of findings of subsidiary facts in such a situation").

It will be recalled that there was a search of Gagnon's apartment in Quebec. This yielded, among other things: firearms, knitted caps with eye slits, newspaper clippings about the Springfield bank robbery, telephone numbers, photographs, swimming trunks (matching those in which a suspect in the holdup had been seen), wall posters, a street map of Springfield, currency, and a bullet proof vest, all of which had probative force in building the Commonwealth's case. That search had been conducted without a warrant, and Gagnon invokes the protection of the Fourth Amendment to the United States Constitution. Searches in foreign countries by the police of foreign countries do not, however, have to comply with American requirements, and the exclusionary rule developed under the Fourth Amendment, as a general proposition, has no application. This is because the object of the exclusionary rule is to deter the police from illegal searches and seizures, a purpose not susceptible of achievement so far as the police of another nation are concerned; they are not likely to be instructed or deterred by the suppression of evidence in accordance with rules by which they are not accustomed to play. *Commonwealth* v. *Wallace*, 356 Mass. 92, 95 (1969), and cases cited. *United States* v. *Rose*, 570 F.2d 1358, 1361-1362 (9th Cir. 1978).

To this general rule two exceptions have developed. The first calls for invocation of the exclusionary rule if the circumstances attending the search and seizure are such that they shock the judicial conscience. *Birdsell* v. *United States*, 346 F.2d 775, 782 n.10 (5th Cir.), cert. denied, 382

U.S. 963 (1965). *United States* v. *Rose, supra* at 1362. *Stowe* v. *Devoy,* 588 F.2d 336, 341-342 (2d Cir. 1978), cert. denied, 442 U.S. 931 (1979). There was nothing about the search of Gagnon's locker and apartment that shocks the conscience. It was not a random search, but one based on information. No violence, torture, or deviousness was involved. See, e.g., *United States* v. *Toscanino,* 500 F.2d 267, 276 (2d Cir. 1974).

The second and more pertinent exception is that the exclusionary rule may be invoked if American police participate in the search in the foreign country, or if the authorities in the foreign country who conduct the search, in fact, are acting under the direction of their American counterparts, and as their agents. More than cooperation by American police must appear; there must be direct participation or, as it is sometimes said, a joint venture by the American and foreign police. So, for example, the use by Mexican officials of a deputy sheriff from Texas as an interpreter in Mexico in questioning a defendant was insufficient evidence of collaboration. *Birdsell* v. *United States,* 346 F.2d at 782. Cooperation by United States agents with Philippine authorities before and after a raid did not establish a joint venture because there was no evidence that the American police either instigated, or were physically present during, the raid. *Stonehill* v. *United States,* 405 F.2d 738, 746 (9th Cir. 1968), cert. denied, 395 U.S. 960 (1969). A telephone call to Toronto police by Federal agents in New York concerning an American living in Toronto who might have information about stolen securities did not make the agents participants in the search that followed. *United States* v. *Morrow,* 537 F.2d 120, 140 (5th Cir. 1976), cert. denied sub nom. *Brennan* v. *United States,* 430 U.S. 956 (1977). In *United States* v. *Benedict,* 647 F.2d 928, 930-931 (9th Cir.), cert. denied, 454 U.S. 1087 (1981), presence by American agents at a search of an apartment, which the Thai police had initiated, did not indicate more than a passive role by the Americans. See also *United States* v. *Rose,* 570 F.2d at 1362; *United States* v. *Maher,* 645 F.2d

780, 783 (9th Cir. 1981). Compare *United States* v. *Hensel,* 509 F. Supp. 1364, 1372-1373 (D. Me. 1981) (cooperation between Coast Guard and Canadian officials in high seas chase, boarding and search of a vessel sufficient to make out a joint venture). See Restatement (Revised) of the Foreign Relations Law of the United States § 443(4) & comment a (Tent. Draft No. 3, 1982).

Corporal Dube, the Canadian officer who had directed the search of Gagnon's locker and apartment on February 4, 1978, testified at the suppression hearing that he had been induced to do so by a tip from an informant, received around 1:00 P.M., that guns were stashed in the locker and were to be used in an assassination that very evening. Defense counsel, who were attempting to find enough linkage between Massachusetts and Canadian police to establish that the search had been a joint venture, probed for the identity of the informer in order to test if there was one and, if he existed, whether he was from Massachusetts or Canada or linked to the Springfield case. In this effort they were promptly cut off by the judge.

The State usually has a privilege to withhold the identity of an informer, particularly where the issue is suppression of illegally obtained evidence.[12] *Commonwealth* v. *Ennis,* 1 Mass. App. Ct. 499, 501 (1973), and cases cited. *Commonwealth* v. *Collins,* 11 Mass. App. Ct. 126, 139-140 (1981). *Commonwealth* v. *Abdelnour,* 11 Mass. App. Ct. 531, 534-537 (1981). See *Commonwealth* v. *Douzanis,* 384 Mass. 434, 441-443 (1981). If the credibility of the informer is sharply drawn in question, the trial judge may conduct an examination in camera to see if the information obtained is reliable or credible. *Commonwealth* v. *Abdelnour,* 11 Mass. App. Ct. at 536 n.5 (which collects authorities). See Proposed Mass.R.Evid. 509(c)(3) (July, 1980).

---

[12] The case for revealing the informant's identity becomes stronger if his identity or the contents of his communication bear on the guilt or innocence of the defendant. *Roviaro* v. *United States,* 353 U.S. 53, 60-61 (1957). *Commonwealth* v. *Ennis,* 1 Mass. App. Ct. 499, 501-502 (1973).

Here, Dube, in response to specific questions of counsel, had testified unambiguously that the informant was a Canadian policeman, and not an American. Questions by defense counsel as to whether the informant was an undercover agent were excluded. It would have been better if the judge had allowed those questions to be asked since the overt or covert status of the informant has a bearing on whether his identity may be disclosed without drying up the flow of information to which the police have access. Cf. *Roviaro* v. *United States*, 353 U.S. 53, 62 (1957). But the judge heard enough so that he could perform his role of deciding whether he needed disclosure of the informant to gauge Dube's credibility. *McCray* v. *Illinois*, 386 U.S. 300, 308-309 (1967). *State* v. *Burnett*, 42 N.J. 377, 388 (1964).

Defense counsel did not manage more than an assertion of doubt about the existence of an informant. In the face of Dube's description of the informant's nationality and occupation, the occasion called particularly for "an adequate threshold demonstration . . . that the police [had] fabricated the informant's existence." *Commonwealth* v. *Abdelnour*, 11 Mass. App. Ct. at 535-536. See also *Commonwealth* v. *Douzanis*, 384 Mass. 434, 442-443 (1981). None of the Canadian police behavior in making the search was inexplicable in light of Dube's testimony. See 1 LaFave, Search and Seizure § 3.3, at 578-579 (1978); *Commonwealth* v. *Abdelnour*, *supra* at 537. Indeed, it is hard to know why Dube needed to invent the "assassination plot" story if either Canadian or American colleagues had asked him to search Gagnon's premises in connection with the Springfield holdup.

Even if, as the defense urged at side bar, the identity of the informant might have established a link between Dube and the Springfield police, that, without more, showed little promise of establishing the very close collaboration which, under the cases previously discussed, would cause the Fourth Amendment to apply to a foreign search. Nothing could have been lost by an in camera examination of

Dube by the judge, but we do not think the judge's refusal to do so was an abuse of his considerable discretion.

4. *Failure to allow inspection of Dube's report.* At an earlier stage of the proceedings, Gagnon had moved to be allowed to inspect written statements made by prosecution witnesses. A Superior Court judge (who was not the same judge as the one who presided at the suppression hearing and at the trial) allowed the motion on the authority of *Commonwealth* v. *Lewinski,* 367 Mass. 889, 902-903 (1975). That opinion provides that a defendant might, without showing of a particularized need, move for discovery of prior written statements of prosecution witnesses which are available to the prosecution and are related to the subject matter of their testimony at trial. *Id.* at 902. Allowance of the motion is not automatic, *ibid.,* but here the motion was granted. It developed in examination of Dube that he had made a written report concerning his conversation with his informant and about the search of Gagnon's apartment. That report was physically available in Springfield. Defense counsel pressed their right to examine the report under the previously allowed motion and under *Lewinski.* Without inquiring whether the report was previously known to the prosecution, or inquiring in camera — as requested by the defense — whether the report disclosed security reasons (e.g., revealing confidential investigatory material, notably the identity of the informer) for not allowing inspection of it (see *Lewinski, supra* at 902), the judge flatly refused any inspection of the report.

To have refused an in camera examination of Dube's written report to see if it cast doubt on his oral testimony (he was not an insignificant witness) was error, and the judge compounded it by failing to identify and preserve the report as part of the record on appeal. *Commonwealth* v. *Lewinski,* 367 Mass. at 903. *Commonwealth* v. *Campbell,* 378 Mass. 680, 700-702 (1979). See generally *Commonwealth* v. *Baldwin,* 385 Mass. 165, 173-178 (1982). In *Campbell, supra,* the court, in the absence of the report in the record, remitted the defendants to motions for a new trial. The

judge who presided at the suppression hearings and at the trial in this case has retired, and it is more appropriate that the question whether Dube's report may be inspected be considered at the new trial, which is required in any event. See Mass.R.Crim.P. 14(a)(2) & 23(a)(1), 378 Mass. 874, 893 (1979).

5. *Identification of two defendants in photographs.* At the Shawmut First Bank there was a device which kept a running photographic record of everyone who came into the main business floor. Guy Dessureault, a detective of the Three Rivers (Canada) police department, examined pictures made on June 3, 1977, and in a sequence of some fifteen pictures identified Bourgeois and Gagnon as present in the bank. Photographs which showed the presence together of two men from different cities in Canada in a bank in Springfield one week before the holdup[13] had obvious probative value. The defense objected that Dessureault ought not to be allowed to testify that among the faces in the pictures were those of Bourgeois and Gagnon, i.e., the jury were as able as a police officer to match the defendants with the faces in the photographs. See *Commonwealth* v. *Nassar,* 351 Mass. 37, 41-42 (1966).

Between the time, however, when the pictures were taken in June, 1977, and the trial in 1978, the defendants had grown beards and altered their hair styles. Dessureault had arrested Bourgeois and Gagnon and was familiar with their earlier guises.[14] On these facts the opinion of Dessureault was of value because the subject matter to which the testimony relates, i.e., the match-up between two of the defendants and faces in the pictures, could not be reproduced or described to the jury precisely as it appeared to Dessureault, who was familiar with the defendants' earlier appearance. Also the facts were such as persons in general are

---

[13] There were also photographs of the holdup itself, but the robbers were masked.

[14] Dessureault had also identified a picture of Gagnon as being similar to Gagnon's appearance when he arrested him.

capable of comprehending and understanding. *Commonwealth* v. *Vitello,* 376 Mass. 426, 459-460 (1978). No error, therefore, attended Dessureault's matching of the photographs with the defendants, save for one of those photographs.[15]

6. *The circled photograph.* One of the bank photographs had two heads circled in red and with red numbers next to them. On the back the numbers were keyed to Bourgeois and Gagnon. The initials GD appeared. Dessureault was allowed to testify that the markings were his as were the initials. He further testified that he had received the picture from the Springfield police with an inquiry whether he recognized any of the faces in the picture. The inked and initialed identification of Gagnon and Bourgeois had been his response.

Admission of the marked up photograph and Dessureault's testimony was sharply objected to as proving nothing other than that Bourgeois and Gagnon were known to the Canadian police and, inferably, were bad men. See *Commonwealth* v. *Clifford,* 374 Mass. 293, 298 (1978), and cases cited; *Commonwealth* v. *Cefalo,* 381 Mass. 319, 336 (1980). As more than a dozen photographs had been admitted from the bank sequence of June 3, 1977, for purposes of placing the defendants in the bank, the photograph in that sequence marked by Dessureault and his accompanying testimony had little, if any, additional probative value, and that was overwhelmed by prejudicial effect. *Commonwealth* v. *Richmond,* 371 Mass. 563, 565-566 (1976). Indeed, it is hard to see what purpose the marked picture and Dessureault's explanations of the markings could have had other than to brand Bourgeois and Gagnon as "pros," the characterization which the district attorney applied to them in

---

[15] Later in the trial the defense called as a witness Denys Godin, a Canadian lawyer, who knew Bourgeois and Gagnon. Godin testified that he did not recognize Bourgeois and Gagnon in the pictures. Thus, the defense also offered witnesses to interpret the pictures. That may have been done, however, to neutralize Dessureault's identification and cannot be presumed to have been a waiver of the defendants' objection.

closing argument.  Compare *Commonwealth* v. *Chalifoux,*
362 Mass. 811, 817 (1973).  Of course, if relevant, evidence
is not made inadmissible because it has a tendency to in-
dicate that the defendant might have run afoul of the
criminal justice system before.  *Commonwealth* v. *Des-
champs,* 1 Mass. App. Ct. 1, 3 (1972).  The failing here is
that there was no other point to admitting the marked pic-
ture in view of the substantially similar unmarked pictures
which were introduced in evidence.  Admission of the
marked photograph was error.  Compare *Commonwealth*
v. *Westmoreland,* 388 Mass. 269, 279 (1983).

7. *Admission of Gagne's prior convictions.*  Norman
Gagne, one of the three defendants, took the stand.  On
direct examination his counsel, Mr. Gordon, brought out
that Gagne had served time in Canadian jails.  The prose-
cution was equipped with records of Gagne's conviction of
conspiracy to commit armed robbery; illegal possession of a
carbine; illegal possession of a revolver; and illegal posses-
sion of a motor vehicle.[16]  After extensive colloquy among
counsel and the judge, Gagne was examined by the prosecu-
tor, without objection, about those convictions, and cer-
tified records of them were, by prior agreement between
counsel, admitted in evidence.  Gagne claims on appeal
that his lawyer's agreement to the admission of the convic-
tions in evidence constituted ineffective assistance of counsel
for the reason that the Commonwealth had not shown that
Gagne either had the benefit of counsel or had waived
counsel when the convictions were obtained.

Evidence of conviction of a crime is, of course, admissible
for the limited purpose of impeaching the credibility of a
witness, subject to certain express limitations.  G. L. c. 233,
§ 21.  See the discussion in Liacos, Massachusetts Evidence
150-158 (5th ed. 1981).  See also Proposed Mass.R.Evid.
609 (July, 1980).  But the defendant must have been repre-
sented by counsel, or have knowingly and voluntarily waived

---

[16] The convictions appear to have been related to the same event; the
sentences imposed provided that they were to be served concurrently.

counsel at the time of the conviction. *Loper* v. *Beto*, 405 U.S. 473, 483 (1972). *Commonwealth* v. *Cook*, 371 Mass. 832, 833 (1977). The burden of showing that counsel was present or waived is on the prosecution. *Commonwealth* v. *Barrett*, 1 Mass. App. Ct. 332, 335-336 (1973), and cases cited.

We will not speculate whether defense counsel for Gagne[17] knew that Gagne had counsel at the time of the convictions, or whether counsel was uncertain what information the prosecution had. We are certainly not prepared to say that his tactical decision constituted ineffective assistance of counsel. This trial lasted six weeks and was exceptionally hard fought. Pretrial motions were made and extensively argued; 245 exceptions were taken by the defense.[18] It is hardly fair, in the relative calm of the appellate process, to cry ineffective assistance of counsel.

Because the question may arise again on retrial, it is necessary to discuss whether a conviction in a foreign country must have been counseled or counsel-waived. In Canada a person who has been arrested or detained has a right to call and speak with a lawyer. See Canadian Bill of Rights § 2, as appearing in Martin's Annual Criminal Code 837 (1981); Cohen, Due Process of Law — The Canadian System of Criminal Justice 17-21, 77-79 (1977). It appears Canadian law does not require that a defendant have a lawyer or that he be tried with the assistance of a lawyer. Spetz, Canadian Criminal Law 163 (1972). See *State* v. *Meyer*, 26 Wash. App. 119, 127 n.3 (1980). If Canada does not require the presence of counsel to the same extent our jurisprudence does,[19] may not an uncounseled conviction be used on the

---

[17] The other defendants also raise the issue on appeal, arguing that they were derivatively hurt by evidence that Gagne was no stranger to armed robbery. They also did not object to admission of the convictions.

[18] Indeed the trial went beyond hard fighting and was often characterized by uncalled-for interruptions and sophomoric squabbling, discourtesy and backbiting between the district attorney and defense counsel. Compare *Commonwealth* v. *Mahdi*, 388 Mass. at 681.

[19] See *Gideon* v. *Wainwright*, 372 U.S. 335 (1963).

basis of the same reasoning as permits the introduction of evidence illegally seized, namely, that rules devised to govern our criminal justice procedures have no application to the criminal justice system of another country? A difference between the two is that the exclusionary rule as to illegally obtained evidence — even though the evidence is reliable — is designed to encourage lawful police practices, and to deter unlawful ones, while the concern about uncounseled convictions is based on their possible unreliability. The elements of a fair system of justice, however, are far from absolute, and there is a certain arrogance in labeling as unfair and deficient a system which does not comport with the notions of judges and Legislatures in this country. See *Carey* v. *Zayre of Beverly, Inc.,* 367 Mass. 125, 128-130 (1975), in which evidence of an uncounseled conviction was admitted in a civil action, in part on the ground that no deterrent purpose could be served by excluding it, since the authorities would have little interest in the outcome. The same may be said of court authorities of a foreign country; they are not likely to be greatly concerned about the effect of their procedures on other jurisdictions. See also *State* v. *Meyer,* 26 Wash. App. at 125-128, in which the court said that comity required giving effect to foreign convictions, except in an extraordinary case. Compare *People* v. *Wallach,* 110 Mich. App. 37, 69-72 (1981), which places on the prosecutor the burden of establishing whether a foreign conviction was obtained in accordance with fair procedures.

An extraordinary case would be one where the foreign proceedings were blazingly unfair, e.g., involving torture, shocking psychological pressure, or a refusal to permit a defendant to testify on his behalf or to confront his accusers. Although the burden is on the prosecution in cases involving convictions by a jurisdiction in (or operating under the laws of) the United States to establish that a conviction was counseled (or that counsel was waived), *Commonwealth* v. *Barrett,* 1 Mass. App. Ct. at 335-336, the burden does not fall on the prosecution to demonstrate that the foreign con-

viction was fairly obtained. That would require endless
screening of foreign records, often with attendant language
problems. If there was something extraordinary about the
foreign proceeding, the facts are more readily available to
the defendant. Federal courts which have considered the
issue have placed on the defendant the burden of demon-
strating lack of due process in a foreign conviction. *United
States* v. *Wilson,* 556 F.2d 1177, 1178 (4th Cir.), cert.
denied, 434 U.S. 986 (1977). *United States* v. *Manafzadeh,*
592 F.2d 81, 90 (2d Cir. 1979). *United States* v. *Rodarte,*
596 F.2d 141, 146 (5th Cir. 1979).

The balance of the issues on appeal are unlikely to recur
at a new trial. Those concerned: an outburst by the defend-
ant Bourgeois;[20] a restriction on the closing argument of
counsel for Bourgeois; and a claimed error in the instruction
on joint enterprise that, in context, is more likely a typo-
graphical error in the transcript.

The judgments are reversed, the verdicts are set aside,
and the case shall stand for a new trial.

*So ordered.*

SMITH, J. (dissenting). I respectfully dissent from the
holding of the majority that there must be a new trial. Their
conclusion is based on certain conduct of the prosecutor
which they consider to be egregious, purported error by the
judge in regard to the admission of certain evidence, and
challenges by the prosecutor of prospective jurors which the
majority perceive to have been a violation of *Com-
monwealth* v. *Soares,* 377 Mass. 461 (1979). I believe that
any misconduct by the prosecutor was harmless and cured
by instruction to the jury by the judge, that the error by the

---

[20] Bourgeois stated to Gagne's lawyer in a manner which the jury might
have heard, "Now hear me, and hear me good. We're all in this
together." This remark was not calculated to help Gagne in his effort to
extricate himself from the prosecution's joint venture theory of the case.

judge was harmless, and that the record is inadequate to show and in any event does not show a *Soares* violation.

Under the heading "[p]rosecutorial error," the majority opinion cites a single statement made by the prosecutor, early in the trial, as one reason for their conclusion that the convictions must be reversed. The utterance by the prosecutor, which of course should never have been made, vouched for the credibility of the Commonwealth's witnesses. Defense counsel objected to the statement and moved for a mistrial, which was denied by the judge. The judge, instead, gave an instruction to the jury to disregard the statement. The majority state that the judge's instruction "scarcely came to grips with the problem." But that observation is at odds with the reaction of defense counsel, who did not object to the judge's instruction. Their conduct is of signal importance for they, unlike us, were present and could actually hear and assess the impact of the instruction. By contrast, our knowledge of the worth of the instruction is limited to what we may ascertain from the printed page. In view of their vigilance and aggressiveness in challenging the conduct of the trial throughout its duration,[1] one can only conclude from their silence in the face of the judge's instruction that they were satisfied that the trial was back on an even course by the manner of the judge's delivery of the instruction, its content and its reception by the jury.[2] In addition, weeks after the comment by the prosecutor, the judge in his closing instructions informed the jurors that they were the sole judges of the credibility of the witnesses.

---

[1] The record discloses that the interests of the several defendants were zealously guarded by aggressive, experienced, and skillful trial counsel. As to their vigilance, as the majority opinion notes, 245 objections were taken by defense counsel during the course of the trial.

[2] The majority's opinion invites a comparison between the judge's instruction in this case and the judge's instruction in *Commonwealth* v. *Hoppin*, 387 Mass. 25, 28-32 (1982), "where strong and precise instructions, although somewhat belated, did not neutralize a prosecutorial error" (*supra* at 15). The court in *Hoppin* specifically stated that the timing of the judge's instruction was one of the primary reasons for the reversal. *Id.* at 31. Here, the curative instruction was timely.

Under the same heading, the majority opinion cites other instances or purported prosecutorial misconduct that occurred during the long trial. None of these examples was the subject of objection, and apparently the majority do not hold that even considered cumulatively they require a new trial. In any event, any excess by the prosecutor in his closing argument was cured by the judge in his charge to the jury.

The majority find reversible error in the admission in evidence of a marked photograph. A detective of the Three Rivers (Canada) police department testified that he had received the picture from the Springfield police with an inquiry whether he recognized any of the faces in the picture. The inked and intialized identification of Gagnon and Bourgeois had been his response. Timely objection to the introduction of the photograph was made by defense counsel on the ground that the picture was not necessary and would show "that Bourgeois and Gagnon were known to the Canadian police and inferably, were bad men." I agree with the majority that the introduction in evidence of the marked photograph was error,[3] but I believe that it was harmless error in light of the overwhelming evidence against the defendants. *Commonwealth* v. *Mandeville*, 386 Mass. 393, 400 (1982).

The majority find that there was also a violation of the principles enunciated in *Commonwealth* v. *Soares*, 377 Mass. 461 (1979).[4] In *Soares*, the Supreme Judicial Court held that the exercise of peremptory challenges to exclude members of certain discrete groups from the jury "solely on

---

[3] The majority in their opinion state, "[I]t is hard to see what purpose the marked picture and Dessureault's explanations of the markings could have had other than to brand Bourgeois and Gagnon as 'pros,' the characterization which the district attorney applied to them in closing argument" (*supra* at 128-129). The prosecutor did not refer to the marked photograph in his closing argument. He did characterize the defendants as "pros," but only in the sense that they prepared beforehand to rob the bank.

[4] The right to be tried by an impartial jury is so basic that its infraction can never be treated as harmless error. See *Commonwealth* v. *Soares*, 377 Mass. at 492.

the basis of bias presumed to derive from [their] member-
ship in the group" violated the defendants' right to a trial
before a jury of their peers as guaranteed by art. 12 of our
Declaration of Rights. *Id.* at 488. The court included "na-
tional origin" as part of "those generic group affiliations
which may not permissibly form the basis for juror exclu-
sion," *id.* at 488-489, and I agree with the majority that per-
sons who are French-Canadians are members of a discrete
group for the purposes of *Soares.* My disagreement with the
majority is two-fold: (1) *Soares* does not apply because of
the limited record in this case; and (2) if *Soares* does apply,
there was no violation.

In *Commonwealth* v. *Soares, supra,* the court addressed
the problem of retroactivity and fashioned a two-prong test
that had to be met before the *Soares* principles would be ap-
plied. The court held that the rule in *Soares* applies to a
case, (1) that was pending on direct appeal on March 8,
1979, the date of the *Soares* decision, and (2) where the
record is adequate to raise the issue. 377 Mass. at 493
n.38.[5] The trial in this case concluded some 270 days before
March 8, 1979, and was on direct appeal when *Soares* was
decided; therefore, the first prong of the test is satisfied. It
is my view, however, that the record is inadequate to raise
the issue.

In order properly to assess whether there was a *Soares*
violation, it is necessary to obtain from the record informa-
tion with regard to certain factors. These factors "include
not only the numbers and percentage of group members ex-
cluded, but also common group membership of the defend-
ant and the jurors excluded, and of the victim and remain-
ing jurors." *Commonwealth* v. *Robinson,* 382 Mass. 189,
195 (1981).

---

[5] By contrast, in the leading case of *People* v. *Wheeler,* 22 Cal. 3d 258,
283 n.31 (1978), the Supreme Court of California decided to apply its rule
retroactively only in those cases where the defendant was under a sentence
of death, and in all other cases the rule was limited to voir dire pro-
ceedings conducted after the *Wheeler* decision became final.

The record discloses that the defendants are of French-Canadian ancestry. The victims in the indictments are two bank tellers and a police officer. The record is silent as to their nationality. Of the 105 prospective jurors who were declared to be satisfactory by the judge, the Commonwealth challenged forty-three persons, and the defendants exercised forty-six challenges.[6] There were sixteen persons sworn as jurors. However, there is nothing in the record as to the ancestry of the jurors. I believe, therefore, that the record is not adequate to raise the issue before us. *Commonwealth* v. *Mahdi,* 388 Mass. 679, 690 (1983).

Even if there were an adequate record, I am of the opinion that there was no *Soares* violation. The crux of the majority's holding that there was such a violation is that "[t]here were twenty-three persons with names that were arguably French called from the venire, and the prosecution challenged nineteen of them" (*supra* at 118). I agree with the majority that names are less than a "totally reliable badge of ethnic identity" (*supra* at 119); and that is the reason that I rely on the record. Of the twenty-three persons with "arguably" French names, there is nothing in the record as to the ancestry of eleven of them. But as to twelve of the twenty-three persons, the record indeed shows that

---

[6] There was no objection by the defendants to the manner in which the Commonwealth exercised its challenges. Contrast the defendants' lack of objections in this case with the actions of defense counsel in *Commonwealth* v. *Soares,* 377 Mass. 461 (1979), and other cases that involved the *Soares* principle and were on direct appeal at the time of that decision. In *Soares,* the point was raised by defense counsel objections to each Commonwealth peremptory challenge of a prospective black juror. *Id.* at 473 n.8. Also see *Commonwealth* v. *Clark,* 378 Mass. 392, 407 n.17 (1979), where defense counsel objected to the prosecutor's use of a peremptory challenge to remove a prospective black juror. In *Commonwealth* v. *Walker,* 379 Mass. 297, 300 (1979), the defendant noted, for the record, the prosecutor's peremptory challenge of prospective black jurors and raised the question by a motion for a new trial after the *Soares* decision. In *Commonwealth* v. *Whitehead,* 379 Mass. 640 646 (1980), the Supreme Judicial Court refused to consider an alleged *Soares* violation in a case on direct appeal and cited as one reason the failure of the defendant to protest.

they are of French or French-Canadian ancestry.[7] Of these twelve persons, the majority agree that the Commonwealth was correct in challenging two of them. Of the remaining ten, the Commonwealth stated that it was satisfied with three prospective jurors who spoke French, two of whom had close ties to French Canada.[8] But each defendant challenged these prospective jurors. The actions of the defendants in challenging three individuals, one of known French and two of known French-Canadian ancestry, are astonishing in view of the claims made by the defendants on appeal that they were denied a fair jury because of the actions of the prosecutor in excluding persons with French surnames from the jury.

I repeat that the record is inadequate for us to decide the issue. Further, because of the actions of the defendants in challenging three persons of known French or French-Canadian ancestry, I believe it would be "a perverse misuse of the [*Soares*] doctrine to apply it" to this trial. *Commonwealth* v. *Whitehead*, 379 Mass. 640, 646 (1980).

---

[7] Clues to the twelve persons' ancestry came about in the following manner. Interpreters were necessary in order to translate the proceedings from English to French. The judge asked each prospective juror if he or she understood or spoke French. If the prospective juror so indicated, the judge would instruct the juror, following dictates of *Commonwealth* v. *Festa*, 369 Mass. 419, 430 (1976), that it was the interpreted testimony in English that controlled. During the course of the interrogation of the twelve jurors, their French or French-Canadian ancestry was disclosed.

[8] All three spoke French. One prospective juror, accepted by the Commonwealth but challenged by the defendant, stated that his grandparents and his mother and father came from Canada. He was challenged by the defendant Gagne. Another prospective juror stated that his mother came from Canada. He was challenged by the defendant Gagnon. The third prospective juror who stated that his father and mother were French was challenged by the defendant Bourgeois. The defendants, as the majority note, challenged four jurors who had names that sounded French-Canadian, but I have considered only the three whose French or French-Canadian origins were commented upon.