COMMONWEALTH *vs.* LOUIS PHILIPPE BOURGEOIS
(and companion cases[1]).

Hampden.  January 10, 1984. — May 16, 1984.

Present: HENNESSEY, C.J., LIACOS, ABRAMS, NOLAN, & O'CONNOR, JJ.

*Search and Seizure,* Foreign country. *Evidence,* Informer, Photograph,
   Prior conviction. *Practice, Criminal,* Discovery, Challenge of jurors,
   Comment by prosecutor, Mistrial, Argument by prosecutor, Argument
   by counsel, Instructions to jury. *Jury and Jurors. Witness,* Impeach-
   ment.

Evidence seized in a warrantless search of a defendant's apartment and
   locker, occurring in the Canadian province of Quebec and undertaken
   by Canadian law enforcement officers, was not rendered inadmissible
   at the defendant's Massachusetts trial for armed robbery and other serious
   crimes by reason of the failure of Canadian police to conform to require-
   ments of the Fourth Amendment to the United States Constitution, where
   nothing about the officers' conduct was shocking to the judicial con-
   science, and where apparently there was no direct participation by Amer-
   ican police in the search. [875]
At a pretrial suppression hearing no error appeared in the judge's refusal of
   defendant's request for a report prepared by a Canadian police officer
   containing the name of the informant who had provided Canadian police
   with information leading to the search of the defendant's apartment in
   Canada, where the officer had testified that the informant was a Canadian
   policeman and where other circumstances showed little likelihood that
   the report sought would reveal the very close collaboration by American
   police that would make the foreign search subject to Fourth Amendment
   guaranties. [875-876]
With respect to a criminal case tried before this court's decision in *Common-
   wealth* v. *Soares,* 377 Mass. 461, 488-489, cert. denied, 444 U.S. 881
   (1979), but which was on direct appeal when *Soares* was decided, this
   court concluded that the record was inadequate to raise the issue
   whether the prosecutor had exercised his peremptory challenges of
   prospective jurors in a manner calculated to exclude jurors of French-

[1] Commonwealth *vs.* Jean Marie Gagnon and Commonwealth *vs.* Norman
Gagne.

Canadian or French origin in violation of the prohibitions of *Soares*. [876-878]

A prosecutor's remarks during a criminal trial expressing personal belief in the credibility of the Commonwealth's witnesses were not so prejudicial as to require reversal of the defendants' convictions, when considered in the context of a record which revealed the judge's immediate instructions to the jury to disregard counsel's comments and his final instructions to the jury that credibility of witnesses was an issue solely for their determination. [878-879]

At the trial of criminal charges arising from the holdup of a bank, it was neither error of law nor abuse of discretion to admit in evidence a photograph of two of the three defendants which had been recorded by the bank's surveillance camera a few days before the holdup and which had been marked by a Canadian police officer, to whom it had been mailed for possible identification, permitting the inference that the defendants were known to Canadian police. [879-880]

No error appeared in permitting a police officer to give testimony matching certain photographs, recorded by a bank's surveillance camera a week before the holdup, with two defendants being tried on charges arising from a holdup of the bank, where the defendants had altered their appearances between the time the photographs were taken and the time of trial, and where the witness was familiar with their earlier appearances. [880]

At the trial of three defendants on criminal charges arising from the holdup of a bank, there was no abuse of discretion in the judge's denial of motions by two of the defendants for mistrial and severance arising from their codefendant's outburst before the jury, "Now hear me, and hear me good. . . . We're all in this together," where curative instructions by the judge instructed the jury to disregard the remark and suggested that the remark related to a dispute about trial tactics and not the robbery itself. [880-882]

Where a criminal defendant seeks exclusion of evidence of his criminal convictions occurring in a foreign country, offered by the prosecutor for impeachment purposes, the burden is on the defendant to demonstrate that the convictions were obtained through procedures so fundamentally unfair as to require their exclusion. [882-883]

At the trial of three defendants on criminal charges arising from the holdup of a bank, ineffectiveness of counsel for one of them did not appear from the fact that counsel was not shown to have ascertained whether that defendant had, or had waived, counsel at the time of his Canadian criminal convictions which were admitted in evidence, with counsel's acquiescence, for impeachment purposes. [882-883]

At a criminal trial, the judge did not improperly restrict a defendant's closing argument with respect to the genuineness of certain signatures where the defendant did not raise the issue during trial and where the inference

sought to be placed before the jury could not fairly be drawn from the evidence presented. [883-884]

At the trial of three defendants on criminal charges arising from the holdup of a bank, there was no error in the judge's instruction to the jury on joint enterprise. [884]

A prosecutor's conduct on occasions throughout a criminal trial, including his comments to the jury vouching for the credibility of Commonwealth witnesses, and certain other unobjected-to remarks made in his closing argument, when considered in the context of his entire argument, as well as in light of the evidence at the trial and the judge's instruction to the jury on the credibility of witnesses, did not create a substantial risk of a miscarriage of justice. [884-886]

INDICTMENTS found and returned in the Superior Court on July 12, 1977, August 16, 1977, and September 16, 1977.

The cases were tried before *Tisdale, J.*

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*William T. Walsh, Jr.,* Assistant District Attorney, for the Commonwealth.

*Robert L. Sheketoff* for Louis Philippe Bourgeois.

*Virginia Lee* for Jean Marie Gagnon.

*Richard B. Klibaner* for Norman Gagne.

ABRAMS, J.   The defendants were convicted of armed robbery, while masked or disguised, of a bank employee; armed assault with intent to murder; attempted murder; assault and battery on a police officer; and assault and battery by means of a dangerous weapon.[2] On the basis of errors at trial, the Appeals Court reversed the convictions and remanded for a new trial. *Commonwealth* v. *Gagnon,* 16 Mass. App. Ct. 110 (1983). We allowed the Commonwealth's application for further appellate review. We affirm the convictions.

---

[2] For conviction of armed robbery while masked, each defendant was sentenced to the Massachusetts Correctional Institution, Walpole, for a term of not less than thirty-nine years nor more than fifty-four years. The conviction for assault and battery on a police officer for each defendant was placed on file with the defendant's consent. The sentences on all other convictions were for various terms and all ran concurrently with the sentence for armed robbery while masked.

We summarize the facts.[3] On June 10, 1977, three armed, masked men robbed a branch of the Shawmut First Bank in Springfield of approximately $126,000. In the course of the robbery, bank personnel were held at gunpoint. The robbers escaped through a side door, but not before a bank vice president, observing the robbery from behind his desk, dialed 911 and notified the police.

Officer Edward Petrick, Jr., of the Springfield police department was on the scene within two minutes. From his cruiser, he observed a man pointing to an alley. As the officer reversed the car's direction, he saw a dark colored, four-door sedan operated by a white driver coming from the alley. The police officer pulled behind the automobile, which was moving at a slow rate of speed. The automobiles were almost bumper to bumper when two men suddenly appeared in the rear seat. One of them slid out of the left rear window up to his waist and fired two bullets through the officer's windshield. On observing the person aiming the gun at him, the officer threw himself to the seat. He was not wounded. At trial, he identified the defendant Gagne as the man who had shot at him.

The police officer continued the chase. The getaway car was stopped by traffic, and the officer pulled up behind it. Two men came out of the back seat of the getaway car carrying guns, ran to the front of the cruiser, and opened fire. The police officer fell to the floor of the cruiser. When the shooting stopped, he sat up and saw one of the men, whom he identified as the defendant Gagne, returning to the getaway car, and the other, whom he identified as the defendant Bourgeois, in front of the cruiser, pointing his gun. The officer attempted to run over Bourgeois. Bourgeois fired and the police officer again dropped to the floor.

When the cruiser stopped, the officer pulled his gun and scrambled out of the car. As the officer landed on the ground, he dropped his gun. Then the officer looked up and saw Bourgeois firing at him. The police officer was wounded in the leg; his assailants escaped. Witnesses said that the getaway

---

[3] Additional facts will be stated in our discussion of the issues.

car and another automobile used in the escape bore Canadian license plates.[4]

The police checked local motels and determined that three persons had been registered from June 2 through June 9 at a motel near Springfield. One registration card was signed "Gagnon, J. Ma." and initialed "J.M.G." The defendant Bourgeois was identified by a maintenance man as one of the persons at the motel during this period. Further, either Bourgeois or a friend was seen wearing a red bathing suit with a broad white stripe with the word "Canada" and a maple leaf on the side. On June 9, a person registered at a second motel. That person had an automobile with a Quebec plate, 991 S 523. The car was registered to Gagnon. On June 10, a witness saw two cars with Canadian plates at the motel, parked near some hedges. There were two people in one automobile, and one in the other. Both cars left and drove in the direction of Springfield.

On August 5, 1977, Constable Paul Robb of the Ontario Provincial Police observed two males driving an automobile with a Quebec license plate, number 858 T 523, the license plate number reported by the Springfield motel maintenance man and pieced together from accounts of persons who observed the getaway. The constable stopped the car, arrested Paquette and the defendant Gagne. The constable searched the automobile. Among the items found were more than $3,000

---

[4] A witness observed the numbers 858 T on one license plate, and Officer Petrick remembered the last three numbers as 523. A maintenance man at a local motel observed an automobile with a Quebec plate 858 T 523 parked near the motel. Gagne was identified by this witness as the occupant of the car. At trial, Gagne confirmed the fact he drove the car to Springfield but claimed he was paid $100 to do so by a fourth man, Andre Paquette, and that he had no knowledge of the joint venture. This car was registered to Paquette, a friend of Gagne. Prior to trial, Paquette pleaded guilty to being an accessory before the fact to armed robbery while masked.

A civilian witness observed a second car with a Quebec plate 991 525 at the time of the getaway. Another witness identified Gagnon as the driver from a photographic array supplied by Canadian police, and at trial he again identified Gagnon as the driver of the car. The car was registered to Gagnon. By June 28, some eighteen days after the robbery, both automobiles had been sold.

in American money[5] in a man's handbag,[6] approximately $2,500 in Canadian currency, and a receipt from a Ford dealership indicating that $2,943 had been paid in cash for the car then being driven by Paquette.[7]

After learning that cars bearing Canadian plates were used in the robbery, the Springfield police communicated with the Canadian police, Quebec Province. The Canadian police provided a photographic array. Officer Petrick selected Bourgeois's photograph as depicting one of the men who had shot at him. Bourgeois was arrested on August 29 by Detective Guy Dessureault of the Three Rivers, Quebec, municipal police.

Film taken by bank cameras from June 2, 1977, to June 10, 1977, was processed by the Springfield police. On September 1, Detective Dessureault received a photograph and a letter from the Springfield police. Detective Dessureault circled two of the persons pictured in the photograph whom he said that he knew and returned the photograph. On February 2, 1978, Detective Dessureault arrested the defendant Gagnon. At trial, he identified the defendants Bourgeois and Gagnon as being the men in the bank film.

On February 4, 1978, Corporal Andre Dube of the Quebec Provincial Police, on the basis of information from an informant, searched a locker and an apartment in the city of Quebec and found four handguns, posters with Gagnon's picture, pictures of Gagnon and Bourgeois, eight newspaper articles per-

[5] Federal Reserve records indicated that money with serial numbers that matched the numbers on the bills found in Paquette's car had been shipped to the Shawmut First Bank in Springfield.

[6] Gagne had crossed the Canadian border with one Margaret Nelson on June 12. She had observed him carrying a man's "handbag."

[7] The car was paid for in cash and by a trade-in of an automobile that Paquette owned. Gagne was present when the car was purchased.

Gagne said that on July 15 and 16, he went on vacation to British Columbia, with Paquette, the defendant Bourgeois, and a third friend, Charles Proulx, and that Gagne returned with Paquette on August 1. Gagne and Paquette were arrested in Ontario on August 5.

The parties stipulated that two airline tickets, dated July 26, 1977, from Vancouver to Montreal, were purchased in the names of Bourgeois and Proulx. The tickets were used, but it is not clear by whom.

taining to the robbery, a bathing suit similar to the one observed at the motel in Springfield, two red ski masks, part of a bullet-proof vest, a map of Springfield, a receipt showing a $200 transaction with the defendant Bourgeois, over $1,000 in American money, an address book with the telephone numbers of the attorneys that defended Gagnon and Bourgeois at trial and of the county jail that serves Springfield, a lease to the apartment, as well as items not relevant to these proceedings. Although the lease was in the name of Gilles DeNeuville, at trial it developed that Gagnon was using that name.[8]

1. *The motion to suppress.* Prior to trial, the defendants filed motions to suppress the items found in Gagnon's apartment and locker on the ground that the search violated the defendants' rights under the Fourth Amendment to the Constitution of the United States to be free from unreasonable searches and seizures. The defendants claimed that the search was a joint venture with the Springfield police and thus subject to American standards.[9] We agree with the analysis of the Appeals Court, and with its conclusion that there was not error in denying the motions to suppress. See *Commonwealth* v. *Gagnon,* 16 Mass. App. Ct. 110, 122-126 (1983).

2. *Failure to allow inspection of the Dube report.* At the hearing on the motions to suppress evidence, the defendants sought to obtain the report of Corporal Dube to discover the identity of the informant who had provided Quebec police with information leading to the search of Gagnon's apartment. "Defense counsel . . . were attempting to find enough linkage between Massachusetts and Canadian police to establish that the search had been a joint venture," *Commonwealth* v. *Gag-*

---

[8] On appeal, the defendants do not challenge the sufficiency of the evidence.

[9] Under the Fourth Amendment, on which the defendants exclusively rely, neither Gagne nor Bourgeois has standing to object to the search of Gagnon's home. See *Rakas* v. *Illinois,* 439 U.S. 128, 134 (1978) ("A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed"). See also *Rawlings* v. *Kentucky,* 448 U.S. 98 (1980).

*non, supra* at 124, and therefore subject to the warrant require-
ment of the Fourth Amendment.

Dube stated that the informant was a Canadian police officer,
and, as the Appeals Court correctly observed, "[d]efense coun-
sel did not manage more than an assertion of doubt about the
existence [or nationality] of the informant." *Commonwealth
v. Gagnon, supra* at 125. The defendants never sought the
report with the name of the informant and facts relating to his
or her identity deleted, and in view of the violence of these
crimes, it clearly was within the judge's discretion to withhold
the identity of the informant. We agree with the Appeals Court
that "the judge heard enough so that he could perform his role
of deciding whether he needed disclosure of the informant to
gauge Dube's credibility." *Id.,* citing *McCray* v. *Illinois,* 386
U.S. 300, 308-309 (1967).

Finally, "[e]ven if, as the defense urged at side bar, the
identity of the informant might have established a link between
Dube and the Springfield police, that, without more, showed
little promise of establishing the very close collaboration which
. . . would cause the Fourth Amendment to apply to a foreign
search." *Commonwealth* v. *Gagnon, supra* at 125-126. In these
circumstances, we conclude that the judge's failure to make
an in camera examination of the report is not reversible error.[10]

3. *Peremptory challenges of jurors.* The defendants allege
that the prosecutor used his peremptory challenges to eliminate
jurors of French-Canadian or French origin, thus falling within
the prohibitions of *Commonwealth* v. *Soares,* 377 Mass. 461,
488-489, cert. denied, 444 U.S. 881 (1979). The defendants
acknowledge that they did not object or create a record of
prosecutorial abuse of peremptory challenges. Nevertheless

---

[10] At the hearing on the motions, at trial and on appeal, the defendants
pressed their claim for Dube's report solely to establish that the search of
Gagnon's apartment and locker and the seizure of items was an unreasonable
search under the Fourth Amendment to the United States Constitution.

We add that the report is in French and is before us. (It was not before
the Appeals Court.) The report identifies a named person from "our bureau
of criminal inquiries from the district of [name deleted]." This person was
described as having provided the Quebec police with the information con-
cerning the apartment and the locker.

they argue that, on the basis of juror and witness surnames, the list of peremptory challenges, and a statement by the prosecutor that he was interested in learning about nationality, we can and should conclude that the prosecutor improperly challenged jurors of possible French-Canadian or French national origin.

The defendants argue that at the time of their trial, *Commonwealth* v. *Soares, supra,* had not yet been decided, and the law was that peremptory challenges could be exercised "without a reason stated, without inquiry and without being subject to the court's control." *Commonwealth* v. *Mitchell,* 367 Mass. 419, 420 (1975), quoting *Swain* v. *Alabama,* 380 U.S. 202, 220 (1965). The defendants assert that we should determine that the presumption of the proper use of peremptory challenges has been rebutted because the record shows that "(1) a pattern of conduct has developed whereby several prospective jurors who have been challenged peremptorily are members of a discrete group, and (2) there is a likelihood they are being excluded from the jury solely by reason of their group membership." *Commonwealth* v. *Soares, supra* at 490. The defendants, however, ignore the requirement that once the presumption has been rebutted, the allegedly offending party is entitled to an opportunity "to demonstrate, if possible, that the group members disproportionately excluded were not struck on account of their group affiliation." *Id.* at 491. If no objections or protests are lodged, opposing counsel is deprived of the opportunity to explain the rationale for the challenges.[11] A record in which a party has not had an opportunity to explain

---

[11] We note that protests of discriminatory use of peremptory challenges were not uncommon before our decision in *Soares* and were essential in providing the trial judge and the opposing counsel with an opportunity to address the matter. This, in turn, often created a record which was adequate for appellate review. See *Commonwealth* v. *Walker,* 379 Mass. 297, 300-301 (1979) (defense protests elicit creation of record adequate to present the issue; no *Soares* violation found); *Commonwealth* v. *Clark,* 378 Mass. 392, 407 n.17 (1979) (defense objection elicits explanation of challenge by prosecutor and statment by judge; no *Soares* violation found); *Commonwealth* v. *Soares, supra.* Cf. *Reddick* v. *Commonwealth,* 381 Mass. 398, 402-403 (1980).

the use of peremptory challenges is inadequate to raise a *Soares* violation.[12]

4. *Credibility vouching.* The defendants objected to the district attorney's vouching for the credibility of the Commonwealth's witnesses during the cross-examination of the police officer by the defendant Bourgeois's attorney.[13] As the Appeals Court correctly noted, "Assertion of personal opinion as to the credibility of a witness . . . is prohibited by S.J.C. Rule 3:07, DR 7-106 (C) (4), 382 Mass. 787 (1981), previously appearing as S.J.C. Rule 3:22, DR 7-106 (C) (4), 359 Mass. 822 (1971). *Commonwealth* v. *Smith,* 387 Mass. 900, 906 (1983)." *Commonwealth* v. *Gagnon,* 16 Mass. App. Ct. 110, 114-115 (1983). There is no per se rule requiring reversal of a defendant's conviction for a violation of the canons of professional ethics. Rather, we evaluate the prosecutor's offensive conduct in light of the entire trial.

Immediately after the colloquy at the side bar that followed the objection to the prosecutor's statement, the judge instructed

---

[12] At oral argument, one defense attorney suggested that surnames are the only means of determining *Soares* violations based on the national origin of prospective jurors because attorneys would not dare to inquire directly into national origin. We do not agree. Allegations of *Soares* violations based on national origin permit a trial judge to obtain information as to the national origin of members of the jury pool in order to create a record that enables the judge to rule on the claim that peremptory challenges are being abused and allows appellate review on an adequate record. See *Commonwealth* v. *Aponte, ante* 494 (1984) (evidentiary hearings to determine ethnicity of persons called for grand jury duty).

[13] The colloquy, which occurred on the tenth day of a thirty-day trial, was as follows:

DEFENSE COUNSEL: "From the comma [referring to a page of Petrick's statement], 'I tried to run them down, and at the same time call in the information to the Station.' Now as to that phrase in your statement, is that true?"

THE PROSECUTOR: "I object."

THE JUDGE: "The grounds, Mr. Ryan?"

THE PROSECUTOR: "I object to the statement, is that true. I would assume any witness we put on here —."

DEFENSE COUNSEL: "I object to that statement."

THE PROSECUTOR: " — we vouch for their credibility, and I don't think that that's the proper way to characterize a question."

THE JUDGE: "Side bench."

the jury to "disregard comments of counsel completely." Defense counsel did not object to this instruction or request any additional instructions. In view of the length of the trial, the judge's immediate instructions to disregard counsel's comments and his final instructions to the jurors,[14] we conclude that the prosecutor's conduct is not so prejudicial as to require reversal.[15]

5. *Identification of two defendants in bank photographs; circled pictures.* At trial, Detective Dessureault of Canada testified that several days after he arrested the defendant Bourgeois the Springfield police mailed him a photograph taken by the bank cameras a few days before the robbery and requested that he identify any individuals whom he knew in the photograph. He circled two persons, wrote their names on the back of the photograph, and returned the photograph to the Springfield police. The officer identified Gagnon and Bourgeois as these two persons in the photograph.[16]

Part of the defense strategy was to suggest that the identification of the three defendants had been coached and obtained by pressure and suggestion. The fact that a witness, who was removed from the pressure of the Springfield police and the district attorney's office, placed the defendants in the bank a few days before the robbery had significant probative value[17] in rebutting defense strategies. Indeed, the defendants do not

---

[14] In at least three different parts of his final instructions, the judge told the jurors emphatically that credibility of witnesses was an issue solely for their determination. Further, he emphasized that "what [counsel] say to you concerning the testimony of any witness doesn't bind you. It's your recollection of what the witness said, and it's your decision as to what interpretation and to what weight and value you should put on each witness' testimony." He told them to "[b]ear in mind that you decide the case, counsel does not, and neither does the Court."

[15] The fact that reversal is not required does not indicate our approval of the prosecutor's conduct.

[16] At trial, Detective Dessureault identified Bourgeois and Gagnon in fifteen bank photographs. The films were of a poor quality and, in addition, the defendants had changed their appearances by the time of the trial.

[17] Gagnon had not been arrested at the time of the officer's identification of him in the bank photograph.

claim that the picture did not have probative value, merely that its prejudicial impact was greater than its probative value. The defendants Gagnon and Bourgeois claim that the picture indicates they were known to the officer and, hence, were "bad men."[18] The judge weighed the competing claims and ruled the photograph admissible. While we might have ruled differently, "[w]hether such evidence is so prejudicial in nature as to outweigh its probative value and preclude its admission 'is a question to be determined by the trial judge in the exercise of his sound discretion.' *Commonwealth* v. *D'Agostino,* 344 Mass. 276, 279, cert. denied, 371 U.S. 852 (1962)." *Commonwealth* v. *Cruz,* 373 Mass. 676, 692 (1977). See *Commonwealth* v. *Bastarache,* 382 Mass. 86, 106 (1980) (autopsy photographs). See also *Commonwealth* v. *Reid,* 384 Mass. 247, 260-261 (1981); *Commonwealth* v. *Repoza,* 382 Mass. 119, 128-129 (1980); *Commonwealth* v. *Cobb,* 379 Mass. 456, 468-469, vacated on other grounds sub nom. *Massachusetts* v. *Hurley,* 449 U.S. 809 (1980); P.J. Liacos, Massachusetts Evidence 410 (5th ed. 1981). We conclude the admission of the photograph does not amount to an error of law or an abuse of discretion.

We agree with the reasoning of the Appeals Court that there was no error in permitting the witness to identify Gagnon and Bourgeois as the men in the other bank photographs. See *Commonwealth* v. *Gagnon, supra* at 127-128.

6. *Defendant Bourgeois's outburst at trial.* On the afternoon of the fourth day of the trial, the defendant Bourgeois, in front of the jury, stood up, took a step in the direction of the defendant Gagne's attorney, and said to him, "Now hear me, and hear me good. . . . We're all in this together." The district attorney immediately requested a recess, which was granted. In the lobby conference that followed, counsel described the episode to the judge, and defense counsel moved for a mistrial or, in

---

[18] With respect to the defendant Bourgeois, that inference is remote at best. Detective Dessureault testified that he had arrested Bourgeois prior to the photographic identification for the Springfield crime. Thus, the jurors were aware of the fact that Dessureault had arrested Bourgeois prior to the photographic identification.

the alternative, severance of the defendant Bourgeois's trial from the other defendants' trial. The defendants were then brought into the courtroom, and the judge cautioned them that such comments would not be tolerated. At this point, the defendant Gagne requested new counsel. Although the defendant Gagne denied that he was influenced by the threats of one of his codefendants, his attorney expressed the view that the defendant Bourgeois's remarks had influenced Gagne's request.

Without referring to Bourgeois's specific remarks, the next morning the judge instructed the jury that the incident was not evidence. "You will not consider it in any way, shape, or fashion in your decision as to the innocence or guilt of these defendants." The judge spoke generally of the rights of defense attorneys and defendants to be free to pursue their own trial tactics without interference from codefendants and added, "so just put what happened yesterday out of your mind and forget about it." Defense counsel for Gagne renewed his motions for a mistrial and severance. The motions were denied and the defendant Gagne's exception was noted.[19]

Relying on *Bruton* v. *United States,* 391 U.S. 123 (1968), the defendant Gagne alleges that, because the jury heard what amounted to a confession by the defendant Bourgeois that implicated the other defendants in the crime and because Bourgeois subsequently exercised the privilege of the Fifth Amendment and refused to testify, Bourgeois's codefendants were deprived of their Sixth Amendment right to confrontation. We do not agree. The instant case "does not involve evidence in any sense 'crucial' or 'devastating' . . . . It does not involve the use, or misuse, of a confession made in the coercive atmosphere of official interrogation." *Dutton* v. *Evans,* 400 U.S. 74, 87 (1970). Further, "the statement contained no express

---

[19] In addition to arguing that the judge erred in refusing to order a mistrial or severance, defense counsel now claim that the judge's curative instruction was defective because he failed to inquire whether the jurors had heard the outburst and whether it would affect their ability to render an impartial verdict. Defense counsel did not request such inquiry then and cannot now complain about the judge's failure to do so. Cf. *Commonwealth* v. *Simmonds,* 386 Mass. 234, 240-241 (1982); *Commonwealth* v. *Hoffer,* 375 Mass. 369, 373 (1978).

assertion about past fact," *id.* at 88, but was merely a spontaneous outburst, apparently directed at Gagne's counsel because of trial tactics.[20]

The trial judge was in the best position to judge the prejudicial impact of the statement and to forge a curative instruction that would stress the necessity of disregarding the remark without stressing the remark itself. The judge's instructions had the additional virtue of suggesting that the defendant Bourgeois's remark related to a dispute about trial tactics and not the robbery itself. In context, the remark, "We're all in this together," could have been interpreted as a disagreement between Bourgeois and Gagne's attorney about the correct way to try the case, particularly since the remark was directed toward Gagne's attorney.

The record indicates that the trial judge gave serious consideration to the potential prejudicial effect of the remarks and concluded that they could be minimized by curative instructions. "The judge was not required to declare a mistrial; such a determination is within the judge's discretion." *Commonwealth* v. *Chubbuck,* 384 Mass. 746, 753 (1981). See *Commonwealth* v. *Barnett,* 371 Mass. 87, 96 (1976), cert. denied, 429 U.S. 1049 (1977); *Commonwealth* v. *Richards,* 363 Mass. 299, 309-310 (1973). There was no abuse of discretion in denying the defendants' motions for mistrial and severance.

7. *Impeachment of Gagne.* Gagne claims that it was error to permit the prosecutor to impeach him with Canadian convictions because the prosecutor did not prove that he had counsel at the time of his convictions. We agree with the reasoning and result reached by the Appeals Court, that the defendant had the burden of showing that his convictions were obtained in proceedings which were fundamentally unfair. See *Commonwealth* v. *Gagnon,* 16 Mass. App. Ct. 110, 129-132 (1983). The defendant made no such showing. Further, we agree with the Appeals Court that "there is a certain arrogance in labelling as unfair and deficient a system which does not comport with

---

[20] At trial, it was Gagne's strategy to claim he had merely delivered one of the cars but had nothing to do with the robbery.

the notions of judges and legislatures in this country." *Commonwealth* v. *Gagnon, supra* at 131. We conclude that Gagne's claim that his counsel was ineffective because he permitted Gagne to be impeached by these convictions is not meritorious.[21]

8. *Defendant Bourgeois's closing argument*. The defendant Bourgeois argues that the trial judge improperly restricted his closing argument. We start with the proposition that a trial judge has broad discretion to limit lengthy, repetitious summations. Review of the transcript discloses that, although the judge did stop defense counsel's argument with respect to the genuineness of the signatures on some motel registration cards, he did not strike defense counsel's remarks. Those remarks were extensive and placed before the jury the same inferences that defense counsel now claims the defendant Bourgeois was prevented from presenting to the jury.

Further, counsel is not free to argue the genuineness of the signatures on the motel registration cards if defendants refuse to provide handwriting exemplars. "Counsel may argue as to the evidence and the fair inferences from the evidence." *Commonwealth* v. *Earltop,* 372 Mass. 199, 205 (1977) (Hennessey, C.J., concurring). See *Commonwealth* v. *Burke,* 373 Mass. 569, 575 (1977). The argument suggested that the Commonwealth had failed in its proof because it did not provide handwriting exemplars for comparison with the signatures on the cards. However, the defendant did not raise this issue during the trial, and there was no record support from which the jurors could conclude that the Commonwealth had not attempted to

---

[21] We note that the defendant Gagne's trial strategy was to demonstrate that, because he was "in jail most of his life, . . . [he was] a natural person to accuse and try to pin a crime on." Defense counsel, in pursuing this tactic, stated in his opening, "So, if being a jailbird and being in a car with someone who owned the car that was identified as being concerned with this robbery makes you guilty, then you've got to find him guilty." In short, it was the defendant's strategic decision to argue that he had been accused of the crime *because* of his criminal record that put his criminal record in issue.

obtain handwriting exemplars.[22] Cf. *Commonwealth* v. *Bowden,* 379 Mass. 472, 485-486 (1980). Thus, the inference suggested was not a fair inference.

9. *Instruction on joint venture.* The defendant Gagne argues that the judge's instruction on joint enterprise was in error, noting that the trial transcript states that the judge instructed the jury that a "joint adventurer must share in the intent to commit the crime and *almost* participate to some extent in the commission of the offense" (emphasis supplied). Defense counsel did not object at trial. The record reflects that, after the instructions, the judge met with counsel. At that conference, Gagne's counsel asked for a further joint venture instruction (a claim not pursued on appeal). The judge stated that he believed he had met counsel's request by telling the jurors that "all must participate [in the joint venture] to some extent." Thus, it seems clear from context and from the conference that the word "almost" is a transcription error. We view the absence of an objection as supporting our conclusion that the word "almost" is a transcription error.

10. *Prosecutor's closing argument.* The defendants challenge a number of remarks made by the district attorney in his closing argument. The defendants lodged no objection to most of the comments appellate counsel now claim as error.[23] "In these circumstances, the defendants are not entitled to appellate review of these allegedly improper remarks as of right. *Commonwealth* v. *Baptiste,* 372 Mass. 700, 712 (1977). *Commonwealth* v. *Earltop,* 372 Mass. 199, 203 (1977). However, we may review such alleged errors to determine if there was a substantial risk of a miscarriage of justice. See, e.g., *Commonwealth* v. *Shelley,* 374 Mass. 466, 469 (1978); *Commonwealth* v. *Earltop, supra* at 203-204.

"In closing argument, counsel may argue the evidence and the fair inferences from the evidence. *Commonwealth* v. *Hoffer,* 375 Mass. 369, 378 (1978). *Commonwealth* v. *Burke,*

---

[22] The record suggests, albeit not clearly, that the Commonwealth was frustrated in its attempt to obtain handwriting exemplars because the defendants refused to provide them.

[23] Counsel on appeal were not trial counsel.

373 Mass. 569, 574-575 (1977). In analyzing whether an improper remark is prejudicial or presents a risk of a miscarriage of justice, the remark must be considered in the context of the prosecutor's entire argument, as well as in light of the judge's instruction to the jury and the evidence at trial. See *Commonwealth* v. *Earltop*, [*supra* at] 203-204; *Commonwealth* v. *MacDonald* (*No. 1*), 368 Mass. 395, 400-402 (1975); *Commonwealth* v. *Nordstrom*, 364 Mass. 310, 316 (1973); *Commonwealth* v. *DeChristoforo*, 360 Mass. 531, 536-539 (1971)." *Commonwealth* v. *Fitzgerald*, 376 Mass. 402, 416 (1978).

Viewed in this light, the district attorney's closing and his conduct on occasions throughout the trial did not create a substantial risk of a miscarriage of justice. *Commonwealth* v. *Freeman*, 352 Mass. 556, 564 (1967). "We again attach significance to the fact that no objection was taken to the remarks at the time they were made, no exceptions were taken, and no curative instructions were requested. . . . [T]he trial judge [must] be given a fair opportunity to correct ambiguous or misrepresentative statements at a time when such a correction could be achieved easily and without prejudice to either side. At this juncture, the remarks must be taken on their face and without the benefit of clarification by the prosecutor or the judge." *Commonwealth* v. *Hooks*, 375 Mass. 284, 296 (1978).

The charge on credibility was strong and accurate. In his final instructions, the judge on at least three occasions[24] told the jurors that evaluating the credibility of witnesses was their sole responsibility, that "it's your decision [not counsel's decision] as to what interpretation and to what weight and value you should put on each witness' testimony." Thus, we are convinced that the prosecutor's comments as to the credibility of the witnesses could not "have materially influenced [the jurors] appraisal of the [witnesses]." *Commonwealth* v. *Freeman, supra* at 564.[25]

---

[24] We note that at the outset of the trial the jurors also were instructed that credibility was a matter solely for their determination.

[25] The Appeals Court criticized the district attorney for referring to testimony not in evidence in the course of his summation. We agree with the Appeals Court that reference to testimony not in evidence "accomplishe[s]

As in *Commonwealth* v. *Bradshaw,* 385 Mass. 244, 277 (1982), "most of the prosecutor's remarks were grounded in the evidence and the few extravagant remarks were responsive to equally extravagant defense tactics in final argument. The jury could be expected to take both arguments with a grain of salt. *Commonwealth* v. *Coleman,* 366 Mass. 705, 714 (1975). No substantial risk of a miscarriage of justice is created where 'conflicting statements of opposing counsel, however inappropriate, probably served only to neutralize each other.' *Commonwealth* v. *Daigle,* 379 Mass. 541, 549 (1980)."

*Judgments affirmed.*

a double fault: discuss[ing] testimony not in evidence and suggest[ing] the Commonwealth had more evidence in its quiver which would have been used, but for technical obstacles." *Commonwealth* v. *Gagnon,* 16 Mass. App. Ct. 110, 116 (1983). A review of the record, however, discloses that the deposition of Margaret Nelson was placed in evidence by counsel for the defendant Gagne without objection. The district attorney urged the jurors to read the deposition.

Our reading of the record indicates that all of the factual matters referred to by the district attorney with respect to Margaret Nelson's testimony were in evidence. To the extent there was a reference to "hearsay," there was no error. All counsel had referred to "hearsay" on numerous occasions throughout the trial.