## COMMONWEALTH vs. NADER TAGHIZADEH.

No 88-P-804.

Suffolk. December 14, 1988. - November 17, 1989.

Present: PERRETTA, KASS, & SMITH, JJ.

*Mayhem. Assault and Battery by Means of a Dangerous Weapon. Insanity. Evidence*, Photograph, Relevancy and materiality, Impeachment of credibility. *Practice, Criminal*, Instructions to jury.

The record of a criminal trial supported the jury's conclusion beyond a reasonable doubt that the defendant had a substantial capacity to appreciate the wrongfulness of his conduct and to conform his conduct to the requirements of the law at the time he threw a liquid containing a high concentration of nitric acid in his wife's face. [58-59]

At the trial of an indictment for mayhem, there was no error in the admission of a photograph of the victim's face taken while she was hospitalized after the defendant had assaulted her with nitric acid. [59-61]

In the circumstances of a criminal trial, the admission in evidence of a foreign court decree that included a finding that the defendant had fathered a child out of wedlock, if error, was not prejudicial. [61-62]

Error, if any, in the exclusion of certain equivocal evidence offered by the defendant at a criminal trial to demonstrate the deterioration of his mental condition was harmless, where the evidence was, at best, only cumulative of other evidence before the jury. [62-63]

At the trial of a criminal indictment there was no error in the judge's curative instructions on a witness's nonresponsive answer to a question by defense counsel, to which no objection was made. [63-64]

INDICTMENTS found and returned in the Superior Court Department on September 3, 1986.

The cases were tried before *Herbert Abrams*, J.

*Alan M. Dershowitz* (*Roanne Sragow* with him) for the defendant.

*Robert J. McKenna, Jr.*, Assistant District Attorney, for the Commonwealth.

SMITH, J. On August 6, 1986, the defendant threw a liquid containing a high concentration of nitric acid in his wife's face. As a result, he was indicted for assault and battery by

means of a dangerous weapon and mayhem. At trial, he raised the defense of lack of criminal responsibility, colloquially known as an "insanity defense." He was convicted on both indictments and sentenced to long terms in prison. He raises various issues on appeal. We conclude that none of them requires a new trial.

1. *Sufficiency of evidence as to sanity.* The defendant argues that the evidence was insufficient to warrant a finding beyond a reasonable doubt that he was sane on August 6, 1986, and that the judge erred in failing to enter a finding of not guilty by reason of insanity. The defendant did not move for required findings of not guilty by reason of insanity at trial.[1] "However, findings based on legally insufficient evidence are inherently serious enough to create a substantial risk of a miscarriage of justice." *Commonwealth* v. *McGovern*, 397 Mass. 863, 867-868 (1986). We therefore review the issue of the sufficiency of the evidence raised by the defendant.

"A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law." *Commonwealth* v. *McHoul*, 352 Mass. 544, 546-547 (1967). As to each indictment, "[w]e must determine whether the Commonwealth's evidence, 'considered in its light most favorable to the Commonwealth, was sufficient to permit the jury to infer the existence of [criminal responsibility],' . . . and 'to bring minds of ordinary intelligence and sagacity to the persuasion of . . . [guilt] beyond a reasonable doubt.'" *Commonwealth* v. *Shelley*, 381 Mass. 340, 346 (1980), quoting from *Commonwealth* v. *Rhoades*, 379 Mass. 810, 815 (1980).

The defendant was born in Iran and lived there until he was eighteen years old. In 1954, he entered medical school in Turkey. After he graduated, he moved to West Germany where he married Erika, the victim in this case. At the time

---

[1] Appellate counsel was not trial counsel.

of the marriage, she was nineteen years of age and the defendant was thirty-two. During their marriage they had three children, two sons (Djan and Shahran) and one daughter (Jeanette).

The marriage turned stormy, and in June, 1984, Erika separated from the defendant. She and the children moved to San Diego, California, where she opened and operated a women's boutique with money from the defendant. He remained in West Germany where he had a successful medical practice. He continued to support his family and usually spent every third month in California with them. Despite the defendant's regular visitations, however, the marriage continued as a one in name only.

By mid-1985, the boutique had begun to fail financially. The defendant blamed Erika for the failure. In a letter to the defendant, dated August 6, 1985, Erika told the defendant that she wanted to sell the business and repeated a request that they end their marriage. The defendant, as in the past, refused her request for a divorce. In December, 1985, he came to San Diego and, with Erika, closed the business.

In February, 1986, Erika met a man named Joseph. Joseph operated a clothing store that was a short distance from Erika's former boutique. They discussed forming a business partnership to operate a clothing store that Joseph intended to open in New York or Boston. Erika introduced Joseph to the defendant, and she told the defendant about the proposed partnership. Although they never went into business together, Erika and Joseph developed a close relationship and saw each other frequently.

Subsequently, Erika decided to move to Boston because Djan had been accepted as a student at Boston University. Between June 17 and 20, 1986, Erika and the children moved the family belongings into an apartment in Brighton. Joseph and one of his friends helped the family move. On June 20, Erika and her daughter, Jeanette, flew to the defendant's home in West Germany. The other two children followed later, and the entire family stayed at the defendant's home for a period of time.

On July 20, 1986, Erika returned alone to the United States. She stayed briefly in New York and then went to the apartment in Brighton. She removed silverware and seven Oriental rugs from the apartment. These items either had been brought to California from Germany by her in 1984, or had been acquired by her while she lived in California. She listed the items that she had taken and left the apartment.

Shortly after Erika's departure, Djan also left West Germany and returned to the apartment in Brighton. Djan had suggested to the defendant that he (Djan) would return to Boston to start negotiations between the defendant and Erika for their separation. Djan believed that a separation agreement would, at last, bring peace to the family.

On or about July 27, 1986, the defendant left West Germany and arrived at the apartment in Brighton with the other two children. Erika was no longer living there. Through the efforts of Djan, the family, including Erika, agreed to have dinner at a restaurant in Boston to conduct a family talk and explore the possibility of a separation agreement between the defendant and Erika. At the dinner, held on the evening of August 5, 1986, Erika, Djan, and Jeanette noticed greenish-yellow stains on the defendant's hands. When asked about the stains, the defendant at first could not provide an explanation for them and then blamed them on nicotine from the cigarettes that he was lighting for Erika. The defendant was a nonsmoker. After the dinner, the family agreed to have brunch the following day in the apartment in Brighton. The defendant returned to that apartment with Djan and Jeanette; Erika and Shahran went elsewhere.

During the morning of August 6, Erika and Shahran arrived at the apartment in Brighton to have brunch, as planned. After breakfast, the family retired to the living room to continue their discussion about a separation agreement. The defendant, as he had the night before, spoke clearly and participated fully in the discussion. However, as he had in the past, the defendant accused Erika of having affairs, and he again blamed her for the failure of the bou-

tique in California. He also accused her of stealing money and began to push and shake her.

Erika asked the defendant to calm down. She then said that she wanted to leave the apartment and that she would either return or call him in a couple of hours. The defendant asked her to wait, and ran into the adjoining dining room. Within a moment, the defendant returned to the living room, and ran toward Erika. She noticed that he had something positioned in his hand to throw at her. The object was a bottle. With one move the defendant opened the bottle and threw its contents into Erika's face. The liquid contained nitric acid, and caused Erika immediate "burning" and "terrible pain."[2] She immediately lost all vision in her right eye and could only see shadows through her left eye. Erika retreated into the bathroom where she threw water on her face. She knew that she had been hit with "some kind of acid." As Erika washed her eyes and face, the defendant entered the bathroom and said in a loud voice, "Now, nobody can look at your face anymore."

When Erika started to leave the apartment, the defendant returned to where he left the bottle, picked it up and chased after her. Djan yelled a warning to his mother, ran and tackled the defendant. Acid flew out of the bottle and struck both the defendant and Djan. When the acid splattered on Djan, he noticed discolorations on his arms that were identical to the stains that he had seen on the defendant's hands the night before at the restaurant.

The family, including Erika and the defendant, crowded into the elevator and descended to the lobby to await an ambulance. The defendant asked Erika and Djan "to cover up for him, to help him." The defendant told Erika, "that she

---

[2]Nitric acid is a very corrosive liquid that is sometimes used to remove warts from the skin. When it is used for that purpose, its concentration is diluted to ten percent. In contrast, the acid thrown in Erika's face had a "high" concentration. The defendant testified that he wanted to remove warts from his finger and discovered the bottle in a box in the apartment three days before the attack. He did not open the bottle, however, because "Q-Tips," needed to apply the acid, were not available.

No one else had seen the bottle in the apartment before the attack.

shouldn't worry [and that] she shouldn't tell anybody, because he [was] . . . going to get her a good plastic surgeon." He also said, "[p]lease don't say anything to [the] police. I['ll] bring you to the best plastic surgeon in Germany, and you know I am a very good surgeon. I can do a lot for you." When the defendant spoke to the children outside the elevator, he said, "[D]on't say anything. Just say your mother did it accidentally." He then told Erika to say the same thing.

Erika was transported to the hospital by ambulance. The defendant, accompanied by Djan, was taken to the hospital in another ambulance. During the ambulance ride, the defendant asked Djan about Erika's condition, especially about her eyes. He also asked Djan, "to help him and tell the police [that] . . . he [the defendant] didn't know what was in the bottle."

Dr. Sheldon Zigelbaum, a psychiatrist, testified as an expert witness for the defendant. He stated that the defendant, at the time of his attack on Erika, was suffering from "a depressive disorder with psychotic features." He also offered a second diagnosis of dementia, stating that psychological tests indicated the possible presence of an organic condition or thought disorder. Dr. Zigelbaum concluded that, in his opinion, the defendant was not criminally responsible on the date of the crime under the test set forth in *Commonwealth v. McHoul*, 352 Mass. at 546-547. He based that conclusion on an examination and psychological testing of the defendant that totalled twenty hours, together with interviews by telephone of two longtime colleagues of the defendant in Germany.

The Commonwealth presented two witnesses on rebuttal: one a psychologist, the other a psychiatrist. The psychologist testified that he examined the defendant for competency and criminal responsibility on August 7, 1986, the day after the attack. The examination consisted of a forty-five minute interview. In response to questions from the psychologist, the defendant denied suffering from hallucinations or delusions on August 6. The defendant told the psychologist that he had never been under the care of a psychiatrist or treated for any

mental disorder. The psychologist testified that the defendant's answers to his questions were responsive and "straightforward, not rambling, and not tangential."

The Commonwealth's other expert, Dr. Martin Kelly, a psychiatrist, testified that he and an associate examined the defendant for approximately two hours and forty minutes on June 16, 1987, some ten months after the incident. At the time of the examination, the doctors had received reports of the Boston police department concerning the incident, some writings of Erika, grand jury minutes and other court documents, and Dr. Zigelbaum's psychiatric evaluations of the defendant. In response to questions phrased in the appropriate language of *Commonwealth* v. *McHoul, supra*, Dr. Kelly gave his opinion that the defendant was criminally responsible at the time he threw acid in his wife's face.

The Commonwealth has the burden of proving that the defendant was sane at the time of the commission of the crime. *Commonwealth* v. *McHoul*, 352 Mass. at 548. To meet its burden, the Commonwealth introduced evidence from a variety of witnesses, both lay and expert, to show that the defendant, up to and including the time of the attack, was not suffering from any mental disease or defect. Two of the defendant's children, as well as the victim, testified that on August 5 and 6 the defendant spoke and acted in a manner which was consistent with that of a sane person. The defendant's statements to his family immediately after the attack, asking them to lie to the police about his involvement demonstrated that he had a keen appreciation of the wrongfulness of his conduct. The next day, the defendant denied that he had experienced any delusions or hallucinations at the time of the attack.[3]

In view of such evidence, the Commonwealth could have relied on the presumption of sanity and the circumstantial

---

[3]Moreover, evidence from the Commonwealth witnesses that the bottle containing the acid had not been seen before in the apartment before the attack (see note 2, *supra*) and also testimony that stains similar in color to the stains left by the acid were seen on the defendant's hands the night before the attack warranted an inference that the attack was premeditated.

evidence and not introduced medical evidence of sanity. *Commonwealth* v. *Brown*, 387 Mass. 220, 222 n.3 (1982). Nevertheless, the Commonwealth did produce such evidence in the person of Dr. Kelly.[4]

In sum, it is abundantly clear on this record that the evidence would have supported the jury's concluding, beyond a reasonable doubt, that the defendant had a substantial capacity to appreciate the wrongfulness of his conduct and to conform his conduct to the requirements of law. *Commonwealth* v. *McHoul, supra* at 546-547.

2. *Evidentiary issues.* The defendant alleges that the judge made several erroneous evidentiary rulings. He claims that these errors prejudiced his insanity defense and warranted a new trial.

(a) *Admission of the victim's photograph.* Two days after the attack, a series of photographs of the victim's face was taken while she was in the hospital. One of the photographs was admitted in evidence over the defendant's objection. The defendant claims, on appeal, that he did not contest the allegation that he threw nitric acid in his wife's face and thereby caused her to suffer serious and permanent injury from the attack; he argues that the photograph lacked probative value and was so inflammatory that it prejudiced his case "by deflecting the jury's attention from his insanity defense."

"It is axiomatic that the admissibility of photographic evidence is committed to the sound discretion of the trial judge, limited only in those rare instances in which the probative value of the evidence is overwhelmed by its inflammatory po-

---

[4]The defendant also argues that, because of "the imbalance between the scope and depth of the psychiatric examinations and tests performed on him by the expert witnesses who testified on his behalf at trial and the scope and depth of the psychiatric examinations conducted by the Commonwealth's rebuttal witnesses," the judge should have entered a finding of not guilty by reason of insanity. This argument is without merit. We are concerned here with the question whether a required finding of not guilty by reason of insanity should have been granted. The defendant's argument goes to the credibility of the expert witnesses for each side. Credibility and weight of the evidence on the issue of insanity is for the jury. *Commonwealth* v. *Louraine*, 390 Mass. 28, 35 (1983). Such issues do not render the evidence insufficient.

tential."[1] *Commonwealth* v. *Repoza*, 382 Mass. 119, 128 (1980), *S.C.*, 400 Mass. 516 (1987). Here, the judge ruled that the photograph was admissible because it was "relevant on the Commonwealth's theory that the defendant possessed the required specific intent to maim or disfigure the victim in the course of the attack." There was no error.

The defendant was charged with mayhem, a crime set out in G. L. c. 265, § 14. The statute provides, in pertinent part, that "whoever, with intent to maim or disfigure, assaults another person with a . . . chemical, and by such assault disfigures, cripples or inflicts serious or permanent physical injury upon such person . . ." shall be guilty of mayhem. The Commonwealth must therefore establish as one of the elements of mayhem that the defendant had "specific intent to do the proscribed acts." *Commonwealth* v. *Hogan*, 7 Mass. App. Ct. 236, 244, *S.C.*, 379 Mass. 190 (1979). While the defendant did not contest the fact that he had thrown nitric acid in his wife's face, the record shows that he did challenge the allegation that he knew that the liquid contained a high concentration of acid and, therefore, that he had the specific intent to maim or disfigure her permanently. The photograph helped to demonstrate the actual strength of the acid and also its effect on the victim. The photograph was also admissible to confront the defendant's denial of his statement shortly after the attack as testified to by Erika and his daughter, "Now, nobody can look at your face anymore." This statement was clearly not the statement of a physician who intended only to splatter the face of his wife with a diluted, rather than a highly concentrated, solution of nitric acid.

Further, even if the defendant had not contested the existence of a specific intent to maim and disfigure his wife, the Commonwealth was obligated to prove each element of its case beyond a reasonable doubt despite the stipulations of the defendant. See *Commonwealth* v. *Torres*, 367 Mass. 737, 742 (1975)("The photograph was offered by the Commonwealth to prove its case, and the defendant's concessions did

not make it inadmissible"); *Commonwealth* v. *Bys*, 370 Mass. 350, 359-360 (1976).[5]

(b) *Admission of German court decree.* The cornerstone of the defendant's insanity defense was the alleged wrongful conduct of his wife, which, he claimed, had caused him such depression that he finally lost the capacity to conform his conduct to the requirements of the law and the capacity to appreciate the wrongfulness of his conduct. Her wrongful conduct, according to his testimony, included numerous marital infidelities that he said started early in the marriage and culminated with her affair with Joseph.

To counteract that evidence, it was the Commonwealth's position that any infidelity by Erika would not affect the defendant's mental condition if he also engaged in similar conduct. To that end, the Commonwealth proceeded to question the defendant, over objections, about an alleged affair that the defendant had in West Germany some years before the attack on his wife. After an initial denial, the defendant admitted that he had "a short relationship only once." The Commonwealth then asked the defendant whether he had fathered a child out of wedlock. The defendant denied the accusation. The trial judge then allowed the Commonwealth to place in evidence, over an objection, a court decree from West Germany which included a finding that the defendant had fathered a child out of wedlock. The judge promptly gave a limiting instruction to the jury that the decree was being admitted for the purpose of impeaching the credibility of the witness. Perhaps it would have been preferable not to admit the court decree in evidence because the question regarding his fathering a child out of wedlock was irrelevant,

---

[5]The judge ruled, without objection, that the photograph would not be seen by the jury until it commenced deliberations. Apparently, he made his ruling in order that the jury would not be distracted from the testimony during the trial. On appeal, the defendant argues that the procedure used by the judge was prejudicial error because it distracted the jury's attention "from the insanity issue precisely at the most crucial moment."

Considering the thorough instructions the judge gave to the jury in regard to the defense of insanity, there is no reasonable likelihood that the photograph distorted the jury's evaluation of that defense. *Commonwealth* v. *Davis*, 10 Mass. App. Ct. 190, 191-192 (1980).

or, at best, collateral. The defendant had admitted an extra-marital affair. Evidence that he had fathered a child as a result of the affair was irrelevant to the issue being tried.

We are not persuaded, however, by the defendant's argument that any error was prejudicial because it directed "the jury's focus to the [defendant's] character . . . [and] allowed the jury's attention to be needlessly shifted from the insanity issue." It was the testimony of the defendant that he had an extramarital affair (the admissibility of which is not an issue on appeal) that focused the jury's attention on the character of the defendant (if it did), not the evidence that he fathered a child as a result of that relationship. Further, the jury had already heard from Dr. Zigelbaum, the defendant's expert witness, that the defendant had told him that he had been accused of fathering a child out of wedlock in Germany. We conclude that in the circumstances of this case any error was nonprejudicial.

(c) *Exclusion of evidence of alleged thefts by Erika and Joseph*. The defendant testified that he knew that Joseph and Erika had stolen property that belonged to his family, and that knowledge had contributed to the deterioration of his mental condition. To show that the defendant's belief was correct, defense counsel attempted to introduce evidence from a witness that Joseph had told him that "we got it," referring to the silverware and rugs taken from the apartment in Brighton by Erika after she had returned from Germany. The testimony was excluded.

The alleged statement of Joseph was highly equivocal. There had already been ample evidence from Erika and others about her close relationship with Joseph and that she had taken items from the apartment. The excluded evidence was, at best, cumulative and would have added nothing to the evidence already before the jury. Any error was harmless.

(d) *Exclusion of letter written by Erika*. The defendant argues that the judge committed error when he excluded a letter written to him by Erika. The letter discusses Erika's concern with the police finding her Porsche automobile which

allegedly had been stolen and that she was now "in big trouble." The defendant claims that the letter was written in July, 1986, just before Erika left Germany for the apartment in Brighton. Erika admitted that she wrote the letter, not in July, 1986, but in 1984. The judge refused to admit the letter because it was written in 1984, two years before the attack. He also ruled that the letter would raise collateral issues.

The defendant argues that the letter was relevant because it corroborated his testimony that Erika and Joseph were stealing his possessions and that such knowledge had a profound effect on his state of mind at the time of the attack on Erika.

If we assume that the letter should have been admitted in evidence, its exclusion was harmless error because the jury heard evidence as to the letter's contents. Erika admitted she wrote the letter. The defendant testified that Erika told him that she and Joseph had stolen the Porsche. That vehicle was the only Porsche that he owned and it was insured in his wife's name. We conclude that the letter was simply "cumulative of evidence before the jury." *Commonwealth* v. *McDonough*, 400 Mass. 639, 646 (1987).

(e) *Judge's curative instruction on nonresponsive answer.* The defendant's daughter, Jeanette, was asked a series of questions by defense counsel concerning Erika's departure from Germany on July 19, 1986. The witness testified that she first learned that her mother had left when the defendant "came home at four in the morning." Defense counsel repeated part of her answer as follows: "At four in the morning?" The witness responded, "Yeah, he came home at four in the morning; and he started hitting me because he thought I knew." Defense counsel objected and moved to strike the last part of the answer. The judge promptly told the jury to disregard it. There was no objection by trial counsel to the content of the curative instruction. The defendant, on appeal, now claims that the curative instruction was confusing and unclear. However, the failure of trial counsel to raise the claim at trial "is of signal importance for [he], unlike us,

[was] present and could actually hear and assess the impact of the instruction." *Commonwealth* v. *Gagnon*, 16 Mass. App. Ct. 110, 133 (1983)(Smith, J., dissenting), *S.C.*, *Commonwealth* v. *Bourgeois*, 391 Mass. 869 (1984).

Although the instruction appears to be somewhat confusing, it is obvious that the judge first told the jury to disregard the answer, then admonished the witness just to answer the question and then again instructed the jury to disregard the answer. There was no error.[6]

*Judgments affirmed.*

---

[6]In response to defense counsel's questions, Jeanette testified that Erika was paying one-half her rent at the time of trial. She was asked how much the rent was, and the judge sustained an objection. The defendant claims the exclusion of the amount of the rent was prejudicial because the level of Erika's disposable wealth at the time of the trial was probative of the amount she had successfully stolen from the defendant prior to the attack.

There was no error. On this record the judge could properly conclude that the amount was irrelevant.